UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

RICK OWEN and
JERY BARTON

Case No.: 19 CR 733

Magistrate Judge Maria Valdez

**UNITED STATES' MEMORANDUM IN SUPPORT OF A FINDING OF PROBABLE CAUSE**

On November 7 and 14, 2019, the Court held a preliminary hearing on the complaint as to defendants Rick Owen and Jery Barton.[1] The government offered the testimony of Special Agent Joseph Villa of IRS, and relied on one exhibit, marked Government's Exhibit 1, which is the filed complaint in this case. The testimony at the hearing, and the allegations in the affidavit in support of the complaint, demonstrate probable cause that the defendants committed the money laundering conspiracy offense as charged.

I.   LEGAL STANDARD

The sole purpose of a preliminary hearing is to determine whether there is "probable cause to believe an offense has been committed and the defendant committed it." Fed. R. Crim. P. 5.1(e). The test for probable cause is whether – under the totality of the circumstances – it is reasonable to believe that the defendant committed a crime. *United States v. Evans*, 27 F.3d 1219, 1228 (7th Cir. 1994). The Seventh Circuit has said that probable cause is "a flexible, practical common-sense

---

[1] Defendant Erick Bustamante waived his right to a preliminary hearing. ECF No. 43.

standard that is met if the facts are sufficient to warrant a person of reasonable caution to believe that an offense has been . . . committed." *United States v. Rosario*, 234 F.3d 347, 350 (7th Cir. 2000). Courts must "make a practical, common sense decision whether, given all the circumstances . . . , there is a fair probability" that the defendant committed the crime. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

## II.    THE EVIDENCE DEMONSTRATES PROBABLE CAUSE THAT DEFENDANTS PARTICIPATED IN A MONEY-LAUNDERING CONSPIRACY AS CHARGED.

Defendants are charged with participating in a money-laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h). The crime of money-laundering conspiracy requires proof that (i) the defendant was knowingly involved with at least one other person for the purpose of money laundering, and (ii) that he knew the proceeds used to further the scheme were derived from an illegal activity. *United States v. Turner*, 400 F.3d 491, 496 (7th Cir. 2005); *see also United States v. McBride*, 724 F.3d 754, 756–57 (7th Cir. 2013). The agreement need not be explicit, and it may be proved by circumstantial evidence. *Turner*, 400 F.3d at 496. The substantive offense of money laundering requires proof that the defendant engaged or attempted to engage in a financial transaction, knowing that it involved the proceeds of specified unlawful activity, and that the defendant knew that the transaction was designed to conceal the source, nature, location, ownership, or control of the proceeds. *Id.*

Knowledge that the proceeds are derived from an illegal activity can be actual or constructive, by a showing of conscious avoidance of actual knowledge. *Turner*, 400 F.3d at 497. The question is not whether a defendant "knew the *actual* source of the

funds, merely whether he knew they were the proceeds of *some* illegal activity." *Id.* In *Turner*, the Seventh Circuit identified some "shady acts" which proved defendant was aware of the illicit source of the funds, including (1) the delivery of large sums of cash, (2) instructions to destroy documents, and (3) the fact that he was approached by investigators at least twice. *Id.* at 497–98. The court concluded that "it is silly to suggest that [defendant] did not know that he was dealing with ill-gotten funds," *id.* at 498, and that "any reasonable person watching all of these strange dealings would clearly believe something was amiss," *id.*

The evidence set forth in the complaint and the testimony at the preliminary hearing shows that there is probable cause to believe that defendants participated in a money-laundering conspiracy. While they cross-examined the government's witness, neither defendant called any witnesses of their own. Defendant Barton offered six exhibits—five of which were bank statements offered solely in support of a flawed argument that the Northern District of Illinois is an improper venue. As described below, the evidence supports probable cause that Owen and Barton were members of a money-laundering conspiracy along with co-defendant Bustamante.

## A. Probable Cause that Owen Participated in the Charged Conspiracy

The evidence shows that Owen's role in the conspiracy was in part to find accountholders who would allow the use of their bank accounts to launder funds, and to assist Bustamante in traveling across the United States collecting narcotics proceeds to launder. *See* Ex. 1 ¶ 5(b).

3

For example, Owen identified CS2 as someone who could provide an account to be used for money laundering, and introduced Bustamante to CS2 for that purpose. *Id.* ¶ 13(b). Between August 2017 and February 2019, at least $2,661,050 in cash was laundered that account, which CS2 described as illicit proceeds. *Id.* ¶¶ 13(d) and (h). Owen's involvement continued, after Bustamante and other associates began using CS2's Company A Bank Account to launder illicit proceeds. CS2 stated that Owen instructed CS2 where to transfer the proceeds after they were deposited into the Company A Bank Account. *Id.* ¶ 13(f).

The evidence also shows that Owen participated in the charged conspiracy by making travel arrangements for Bustamante, to help him travel throughout the United States to collect and deposit narcotics proceeds. For example, on or about April 25, 2019, Owen helped Bustamante make arrangements to travel from Boston to Detroit. Ex. 1 ¶ 132. Law enforcement later observed Bustamante arrive in Detroit, and travel to Wire Transfer Business B in Grand Rapids, where he dropped off the proceeds. *Id.* ¶¶ 135–36. A later search of Wire Transfer B resulted in the seizure of approximately $180,925 in U.S. currency there. *Id.* ¶ 137. Owen later helped Bustamante travel to: (i) Louisville Kentucky on or about April 13, 2019, *id.* ¶¶ 85–88; (ii) Chicago, on or about April 15, 2019, *id.* ¶ ¶ 113–15; and (iii) Chicago, on or about May 15, 2019, *id.* ¶¶ 189–90; all for the purpose of collecting narcotics proceeds.

Owen made the transportation arrangements for Bustamante knowing the purpose of his travel. For example, in an April 15, 2019 conversation between Bustamante and Owen, Bustamante advised that he was in Columbus and traveling

to Chicago. *Id.* ¶ 115(a). Owen asked, "the pick-ups went okay?" *Id.* ¶ 115(b) and acknowledged that "we're not making make any money off anything with Lalo." *Id.* Later, Bustamante told Owen that he was traveling to Michigan because "I have to give it [narcotics proceeds] to one of Lalo's contacts." *Id.* ¶ 132. Bustamante subsequently advised Owen that he was dropping off "Lalo's stuff" in Grand Rapids. *Id.* ¶ 136.

Second, the evidence shows that Owen knew about the illegal nature of the money. In an April 3, 2019 conversation between Bustamante and Owen, Owen asked "what's our stories about the origins" of money that was going to be deposited into Barton's accounts. Owen explained, "you can't say cannabis" as the source of the funds. Bustamante told him to "make something up," so Owen suggested that they would say that it was from the sale of "farm equipment." Ex. 1 ¶ 48(b). Owen knew that the funds were derived from the sale of narcotics, and devised a false story to explain to bankers if they asked about the source of the funds. Owen directly participated in concealing the source, nature, location, ownership, or control of the proceeds himself by creating a false story about the true source of the proceeds.

In another call on April 15, 2019, Bustamante told Owen that Bustamante had gotten a gun pulled on him and was accused of being a DEA informant. Ex. 1 ¶ 106(a). Bustamante continued, saying that "the guys from Colombia" vouched for Bustamante, and advised that he was not working for DEA. *Id.* Bustamante ended that conversation by advising Owen, "it's getting very complicated but everybody that's not part of Lalo's group are still looking at us." *Id.* The evidence further

demonstrates that Owen was aware that Lalo is associated with illegal activity. In a June 7, 2019 conversation between Owen and Bustamante, Bustamante said, "you have no idea the attention that you guys are under, because other guys have stolen half a million, 300 grand. It's a total of 2 million dollars that people have taken from Lalo's group. So, if he thinks he's gonna get away from not paying back the money, . . . he really doesn't understand who these people are, man." *Id.* ¶ 35.

Furthermore, Owen was aware that law enforcement was investigating places where he helped his co-conspirator Bustamante travel to. For example, in a July 4, 2019 conversation between Bustamante and Owen, Bustamante told Owen about the search warrants that law enforcement executed on wire transfer locations in Chicago and Grand Rapids—both places that Bustamante had dropped off narcotics proceeds. Ex. 1 ¶ 201. In this same conversation, Owen also learned that law enforcement seized cash from one of Lalo's "guys" [money couriers], who was doing a "pick up." *Id.* ¶ 201(a).

The evidence and testimony at the preliminary hearing showed probable cause that Owen participated in the charged conspiracy by identifying bank accounts to launder proceeds, and helping Bustamante travel across the country to collect the proceeds. The evidence also shows that Owen knew that the proceeds were derived from an illegal activity based on his knowledge that: (i) Bustamante was traveling across the country making "pick-ups" to deposit in other locations; (ii) Bustamante was accused of being a DEA informant at gunpoint; and (iii) search warrants had

been executed in Chicago and Grand Rapids, at locations where Owen had arranged for Bustamante to travel to deposit cash.

## B. Probable Cause That Barton Participated in the Charged Conspiracy

First, the evidence alleged in the complaint and the testimony of the government witness at the preliminary hearing demonstrate probable cause that Barton participated in the conspiracy. Barton's role in the conspiracy was to supply the bank accounts through which the conspirators conducted the money-laundering financial transactions. Barton allowed Bustamante and others to deposit cash into accounts that Barton held at various financial institutions, and then Barton dutifully transferred those amounts to other accounts as instructed.

For example, in April 2019, Bustamante and Individual F each deposited cash ($45,000 and $34,400 respectively) into Barton's Huntington IOLTA account. Ex. 1 ¶ 50. Within days of those deposits, Bustamante instructed Barton to transfer a portion of those deposits into the Company B account. *Id.* ¶ 51. During that conversation, Bustamante advised Barton that it was "a dealer" who had deposited $34,400 cash into Barton's IOLTA account. Barton acted as instructed and transferred the sums, without even knowing what Company B was. *Id.* (Barton asks Bustamante, "Who is [Company B] exactly by the way?"). The fact that Barton himself didn't know the destination of the money that he himself transferred, combined with all the other indications of illegality, demonstrate that Barton knew the transactions were designed to conceal the source, nature, ownership, or control of the proceeds.

The pattern of large cash deposits into Barton's IOLTA accounts, quick turnaround times from deposit to outbound transfer, the acknowledgment that an individual previously unknown to Barton was "a dealer" who had deposited tens of thousands of dollars in cash into Barton's account, and the fact that Barton did not know to whom he was transferring the funds, all support probable cause that Barton knew that he was participating in money laundering transactions with Bustamante, and that these transactions were not associated with legitimate legal clients.

Second, the evidence shows probable cause that Barton knew that the proceeds were derived from an illegal activity, specifically the sale of narcotics. As described in the complaint, Bustamante and Barton discussed the activities of Lalo, whom Barton knew to be an owner of funds that were deposited into Barton's accounts. In an August 9, 2019 conversation, Bustamante inquired about setting up a new bank account through which they could "process cash" and "be able to exit [transfer out] the funds within 48 hours, 72 hours." *Id.* ¶¶ 36(a) and (b). Barton's response indicated that he knew exactly what the source of the money was—he said, "it's gotta be on a place where they have some experience with those kind of arrangements. Which would be in one of the states where [u/i] cannabis is legal." *Id.* ¶ 36(b). Barton didn't say "hemp," he referred specifically to proceeds from the sale of a controlled substance—cannabis. Later in that same conversation with Barton, Bustamante referred to "situations like with Lalo, or with another friend of mine that has plantations here, and like, 'I just need deposits and send to Mexico . . . but they're giving me a hard time to even put the money into the bank system." *Id.* ¶ 36(c). As

Agent Villa testified, this indicates that the product—the controlled substance—was coming from Mexico, not states where the sale of cannabis is legal. Tr. of Prelim. Hr'g at 100:22 (Nov. 14, 2019).

Moreover, like the defendant in *Turner*, there were plenty of "shady acts" that show probable cause that Barton was aware of the illicit source of the funds. First, on May 22, 2019, Barton was visited by federal law enforcement agents, who asked him about one of the money-laundering transactions through his account—a cash deposit made by Individual F. After the visit, Barton immediately called Bustamante to reassure him that he "told [the agent] nothing." Barton also said, "I am concerned." Ex. 1 ¶ 62(b). Two weeks later, on June 10, 2019, Barton learned that federal law enforcement agents had seized thousands of dollars in cash from the same individual, Individual F, who deposited cash into Barton's account. *Id.* ¶ 65(a).

Barton also received direct inquiries from bank compliance officials questioning certain deposits that had been made into his Huntington Bank accounts, which related to his transactions with Bustamante. In a phone call, Barton told Bustamante that the bank asked about the origins of funds for an $89,000 deposit that Bustamante had made into Barton's account. Ex. 1 ¶ 57. The bank also asked about a June 2018 transfer that Barton conducted from his account to a bank in Luxembourg, which involved Individual A. *Id.* Barton specifically indicated that he did *not* want to speak to Individual A to collect more information about the transaction for the bank. *Id.* ¶ 57(c). Instead, he asked Bustamante to draft an explanation of the transaction. *Id.* These circumstances show that Barton knew of

the illicit nature of the funds that he was processing through his accounts, even if he tried to take pains to avoid knowing all the details.

In another conversation with Bustamante, Barton asked for more information about Individual F, who had deposited cash into Barton's account. Barton wanted to have an explanation prepared for bank officials if they questioned transactions involving Individual F. Barton asked Bustamante if Huntington Bank would "find anything bad" about Individual F if they did a background check. *Id.* ¶ 59(a). When Bustamante described Individual F as "one of [Lalo's] runners," Barton responded that that response is "not what Huntington [Bank] wants to hear." Barton asked if Individual F was "a business associate in some *recognizable…*?" *Id.* ¶ 59(b) (emphasis added). This communication demonstrates that Barton knew that "runner" referred to illicit trafficking of either narcotics or narcotics proceeds, and he could not disclose that fact to Huntington Bank. *See* Ex. 1 ¶ 60.

"Any reasonable person watching all of these strange dealings would clearly believe something was amiss." *Turner*, 400 F.3d at 498. All of this evidence shows Barton's knowledge, despite any attempts he took to avoid learning the *actual* source of the funds that he actively helped to flow through his account. Even if, as he claims, Barton did not know with 100 percent certainty that the money was illegal *narcotics* proceeds, the evidence shows that he knew they were the proceeds of *some* illegal activity. *See Turner*, 400 F.3d at 497. Barton's questions to Bustamante about the transactions showed both his knowledge and his attempts to avoid learning all the details of the transactions that he was facilitating through his bank accounts. For

example, he asked Bustamante to confirm that a particular transfer was "a bona fide transaction as far as you know." Ex. 1 ¶ 33. In that same conversation, he demonstrated again that he had initiated a wire transfer of $35,000 to a destination unknown to him, but that was "a business that Lalo is in." *Id.* Barton's conduct, his questions of Bustamante, and his other statements, show his knowing participation in the conspiracy.

## III.  VENUE IS PROPER IN THE NORTHERN DISTRICT OF ILLINOIS

Defendants' counsel suggest that venue is improper in the Northern District of Illinois. That argument ignores basic conspiracy law and the venue provisions of the money-laundering statute itself.

Defendants are charged with participating in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Ex. 1. A prosecution for a money laundering conspiracy "may be brought in the district where venue would lie for the completed offense . . . or in any other district where an act in furtherance of the attempt or conspiracy took place."[2] 18 U.S.C. § 1956(i)(2). Under Section 1956(i)(1)(A), the completed offense of money laundering may be brought in any district in which the financial or monetary transaction is conducted. For conspiracy charges, "venue is proper against the defendant in any district where a co-conspirator carried out overt acts even though there was no evidence that the defendant had entered that district or that the conspiracy was formed there." *United States v. Ochoa*, 229 F.3d 631, 636–

---

[2] In a money-laundering conspiracy, the government is not required to prove any overt acts in furtherance of the conspiracy. *Whitfield v. United States*, 543 U.S. 209, 219 (2005).

37 (7th Cir. 2000) (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281–82 (1999)).

Here, the evidence introduced at the preliminary hearing included multiple acts in furtherance of the conspiracy in this district. These acts were committed by co-defendant and co-conspirator Erick Bustamante, and they were in furtherance of the conspiracy. On or about August 30, 2017, co-defendant Bustamante traveled to Chicago to collect and launder money owed as a result of law enforcement's seizure of 11 kilograms of heroin. Ex. 1 ¶¶ 9–11. On or about April 16, 2019, Owen helped Bustamante book ground transportation from Columbus, Ohio to Chicago for the purpose of depositing narcotics proceeds. As detailed in the complaint, once in Chicago, Bustamante dropped off proceeds at a wire transfer business in Chicago. Ex. 1 ¶¶ 113–20. On or about May 7, 2019, Bustamante collected approximately $40,000 of narcotics proceeds in Aurora, Illinois, and dropped it off at Wire Transfer Business A in Chicago. *Id.* ¶¶ 138–50. On or about May 17, 2019, Bustamante deposited approximately $156,610 at Wire Transfer Business A in Chicago. *Id.* ¶¶ 192, 195.

Furthermore, Barton and Owen both *knew* that Bustamante was conducting financial transactions in this district in furtherance of the conspiracy. As detailed in paragraph 139 of the complaint, Bustamante and Barton had a phone conversation in which Bustamante advised Barton that he was "flying to Chicago." Barton indicated he knew full well what Bustamante was doing there—Barton asked him, "Are you making a deposit today?" Bustamante answered, "No, most likely it's going

to be tomorrow." *Id.* On or about May 17, 2019, Owen again helped Bustamante make travel arrangements to Chicago for the purpose of depositing cash narcotics proceeds at the wire transfer business. *Id.* ¶¶ 189–96. Additionally, Bustamante deposited currency into Barton's Huntington Bank account at a branch in Oak Lawn, Illinois, in this district. Tr. of Prelim. Hr'g, at 39:22 (Nov. 7, 2019); *see also* Ex. 1 ¶ 70.

Any one of these four transactions, all of which are overt acts in furtherance of the money-laundering conspiracy, provides venue in this district.

## IV.    CONCLUSION

As discussed above, the evidence offered at the preliminary hearing demonstrates that there is probable cause that both defendants Owen and Barton committed the crime of money-laundering conspiracy as alleged. Both defendants should be held to answer in the district court for further proceedings.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    */s/ Matthew J. McCrobie*
        MATTHEW J. McCROBIE
        Assistant U.S. Attorney
        219 South Dearborn Street, Room 500
        Chicago, Illinois 60604
        (312) 353-5356

Dated:  December 20, 2019