1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

3        UNITED STATES OF AMERICA,                    )   Nos. 19 CR 733-1
                                                      )        19 CR 733-2
4                      vs.                            )        19 CR 733-3
                                                      )
5        ERICK BUSTAMANTE, RICK OWEN, and             )
         JERY BARTON,                                 )   Chicago, Illinois
6                                                     )   November 7, 2019
                         Defendants.                  )   11:26 a.m.
7
                              TRANSCRIPT OF PROCEEDINGS
8              BEFORE THE HON. MARIA VALDEZ, MAGISTRATE JUDGE

9        APPEARANCES:

10       For the Government:     MR. MATTHEW J. McCROBIE
                                 United States Attorney's Office,
11                               219 South Dearborn Street, Room 500,
                                 Chicago, Illinois  60604
12
         For Defendant
13       Erick Bustamante:       MR. JONATHAN S. BEDI
                                 Bedi & Singer, LLP,
14                               53 West Jackson Boulevard, Suite 1505,
                                 Chicago, Illinois  60604
15
         For Defendant
16       Rick Owen:              MR. STEVEN SALTZMAN
                                 Steven Saltzman, Attorney at Law,
17                               200 South Michigan Avenue, Suite 201,
                                 Chicago, Illinois  60604
18
         For Defendant
19       Jery Barton:            MS. SUSAN BOGART
                                 Law Offices of Susan Bogart,
20                               111 West Jackson Boulevard, Suite 1700,
                                 Chicago, Illinois  60604
21

22

23                          PATRICK J. MULLEN
                         Official Court Reporter
24                     United States District Court
                219 South Dearborn Street, Room 1412
25                      Chicago, Illinois  60604
                            (312) 435-5565

1      THE CLERK:  19 CR 733, Defendant 1, United States of

2  America versus Erick Bustamante; 19 CR 733, Defendant 2, United

3  States of America versus Rick Owen; 19 CR 733, Defendant 3,

4  United States of America versus Jery Barton; preliminary

5  examination hearing.

6      THE COURT:  On behalf of the Government?

7      MR. McCROBIE:  Good morning, Your Honor.  Matt

8  McCrobie, M-c-C-r-o-b-i-e, on behalf of the United States.

9      THE COURT:  And Mr. Bustamante is present.  On behalf

10  of Mr. Bustamante?

11      MR. BEDI:  Good morning, Your Honor.  Jonathan Bedi,

12  B-e-d-i, on behalf of Erick Bustamante.

13      THE COURT:  And Mr. Owen?

14      MR. SALTZMAN:  Mr. Owen is not present, Judge.  At his

15  first court appearance, you waived his appearance.

16      THE COURT:  I did.  I do recall that.  So Mr. Saltzman

17  is here?

18      MR. SALTZMAN:  Steven Saltzman on behalf of Mr. Owen.

19      THE COURT:  And on behalf of Mr. Barton?

20      MS. BOGART:  Susan Bogart on behalf of Mr. Barton,

21  Your Honor, and he's present in court.

22      THE COURT:  All right.  Are we ready to proceed with

23  the preliminary examination?

24      MR. BEDI:  Your Honor, one thing.  As to Erick

25  Bustamante, at this time we're going to be waiving our request

1    for a preliminary examination.

2         THE COURT:  All right.  Based on that waiver, he will

3    be held to answer in the district court.

4         Mr. Owen wants to proceed?

5         MR. SALTZMAN:  Yes, Judge.

6         THE COURT:  And Mr. Barton wants to proceed.

7         MS. BOGART:  Yes, Your Honor.

8         THE COURT:  Well, I'm going to take a very short break

9    because we will then let the marshals have the in-custody

10   individuals to be taken back to lockup and then we'll resume,

11   so about a five-minute break.

12        MS. BOGART:  Okay.  Thank you.

13        MR. SALTZMAN:  Thank you, Your Honor.

14        MR. BEDI:  Your Honor, may I be excused then?

15        THE COURT:  Yes.

16        MR. BEDI:  Thank you, Your Honor.

17        THE COURT:  You can hang out if you want.

18        MR. BEDI:  Thank you, Your Honor.

19      (Recess.)

20        THE CLERK:  19 CR 733, Defendant 2, United States of

21   America versus Rick Owen; 19 CR 733, Defendant 3, United States

22   of America versus Jery Barton; preliminary examination hearing.

23        THE COURT:  All right.  All counsel who previously

24   stated their appearance are once again before the Court as is

25   Mr. Barton.

1    All right.  The Government may proceed with their

2  first witness.

3    Do you want to sit down?

4    MR. SALTZMAN:  Absolutely, Judge.  My handwriting is

5  bad, and I just learned it's even worse when I'm standing.

6    THE COURT:  Please be comfortable.

7    MR. McCROBIE:  Your Honor, the Government calls

8  Special Agent Joseph Villa.

9    THE CLERK:  Mr. Villa, please raise your right hand.

10    (Witness duly sworn.)

11    THE CLERK:  You may be seated.

12                    JOSEPH VILLA,

13              GOVERNMENT'S WITNESS, DULY SWORN,

14                  DIRECT EXAMINATION

15  BY MR. McCROBIE:

16  Q.  Good morning.  Could you please state and spell your name?

17  A.  Joseph Villa, V-i-l-l-a.

18  Q.  Where do you work?

19  A.  Where I work, I'm a special agent with IRS Criminal

20  Investigation.

21  Q.  How long have you been a special agent with IRS?

22  A.  Since September of 2009.

23  Q.  Briefly, what are your job responsibilities as an IRS

24  special agent?

25  A.  To investigate financial crimes, including tax fraud and

1    money laundering.

2    Q.  In the course of your work as a special agent, have you

3    become familiar with common practices and methods of money

4    laundering?

5    A.  Yes.

6    Q.  Can you describe or give some examples of what those are?

7    A.  Yes.  Some methods are bulk currency movements across state

8    lines or across international lines.  There's also cash

9    deposits into business bank accounts or individual bank

10   accounts and then multiple wire transfers following those

11   currency deposits.

12   Q.  Are you assigned to an investigation of a money laundering

13   organization involving the defendants in this case?

14   A.  Yes.

15   Q.  Approximately when did you become involved in the

16   investigation of these defendants?

17   A.  Around September of 2017.

18   Q.  As part of your work on that investigation, did you conduct

19   a financial investigation into accounts used by the defendants?

20   A.  Yes.

21   Q.  Did you also participate in an interview of defendant

22   Barton?

23   A.  Yes.

24   Q.  Have the defendants in this case been charged by complaint

25   with conspiracy to commit money laundering in violation of 18

1  U.S.C. 1956(h)?

2  A.  Yes.

3  Q.  And more specifically, that was a conspiracy to commit

4  concealment money laundering?

5  A.  Yes.

6  Q.  Were you an affiant on this complaint?

7  A.  No.

8  Q.  Did you aid in the drafting of the complaint?

9  A.  Yes.

10  Q.  Are you familiar with the allegations contained in the

11  complaint?

12  A.  Yes.

13          MR. McCROBIE:  Your Honor, at this time I'd like to

14  approach and provide the witness with Government Exhibit 1,

15  which is a copy of the complaint in this case.

16          THE COURT:  You may.

17          MR. McCROBIE:  Does the Court want a copy?

18          THE COURT:  I do have one.  Thank you.  But you may

19  want to give one to my courtroom deputy for the record.

20          MR. McCROBIE:  Sure.

21      (Brief pause.)

22  BY MR. McCROBIE:

23  Q.  Agent Villa, what is Government Exhibit 1?

24  A.  It is a criminal complaint against Mr. Bustamante,

25  Mr. Owen, and Mr. Barton.

1  Q.  Is this a true and correct copy of the filed complaint and
2  affidavit?
3  A.  Yes.
4  Q.  Could you please turn to the second page?  Was this
5  complaint signed by Magistrate Judge Gilbert?
6  A.  Yes.
7  Q.  How many pages is the affidavit in support of this
8  complaint?
9  A.  It's 119 pages.
10         MR. McCROBIE:  Your Honor, at this time the Government
11  moves Government Exhibit 1 into evidence.
12         THE COURT:  Hearing no objection, that --
13         MS. BOGART:  There was an objection, Judge.
14         THE COURT:  What is the objection?
15         MS. BOGART:  The document contains -- excuse me.  The
16  document contains what I can only describe as a ton of
17  superfluous information that actually has no bearing.  I don't
18  even know if it has a bearing on this complaint because of all
19  unidentified people, but it certainly has nothing to do with my
20  client.  I can just give you a for-instance.
21         THE COURT:  That's all right.  The objection will be
22  overruled.  You may proceed.
23  BY MR. McCROBIE:
24  Q.  Agent Villa, have you reviewed this exhibit?
25  A.  Yes.

1    Q.  Did you see anything in the affidavit that requires
2    clarification?
3    A.  Yes.
4    Q.  What are those items?
5    A.  On page 39, paragraph 47, there's a reference to deposits
6    totalling $491,074 and withdrawals of $452,967.
7    Q.  And do those amounts require clarification?
8    A.  Yes.
9    Q.  And what is that?
10   A.  The total deposits were $622,076.82, and the withdrawals
11   were $588,788.80.
12          MS. BOGART:  I'm sorry.  Could I get those again,
13   please?
14          THE COURT:  Yes.  If you can, speak a little slower on
15   the numbers.
16          THE WITNESS:  Okay.  The deposits are $622,076.82, and
17   the withdrawals are $588,788.80.
18          MR. SALTZMAN:  Excuse me, Judge.  That's paragraph 47.
19          THE COURT:  47.
20          So, Special Agent Villa, I just want to make sure I
21   understand.  So the number, the first number of paragraph 47 is
22   491,074.  That number, you're saying, should be 622,076.82?
23          THE WITNESS:  Yes.
24          THE COURT:  And the second number in that paragraph
25   which is 452,967 should read $588,788.80?

Villa - direct by McCrobie

9

1      THE WITNESS:  Yes.

2      THE COURT:  All right.

3   BY MR. McCROBIE:

4   Q.  So the actual amounts upon double-checking are actually

5   greater than the amounts listed in the complaint?

6   A.  Yes.

7   Q.  Was there anything else that requires clarification?

8   A.  Yes.  Page 110, paragraph 194, subparagraph (a) refers to

9   Individual A, and that should be Employee A.

10  Q.  Is that the same Employee A that's referred to in paragraph

11  193?

12  A.  Yes.  Then in paragraph 194, subparagraph (b), there's also

13  a reference to Individual A.  There's two references to

14  Individual A, and that should be Employee A.

15  Q.  What else?

16  A.  Page 15.

17      MS. BOGART:  I'm sorry.  Are we going backward?

18      THE WITNESS:  Yes.

19      MS. BOGART:  Okay.

20  BY THE WITNESS:

21  A.  It would be subparagraph (d) of 13.  There's a reference

22  that one of Bustamante's associates deposited approximately

23  $313,000.  That was Bustamante, not one of his associates.

24  BY MR. McCROBIE:

25  Q.  And you're referring to the very top line of page 15,

1   correct?

2   A.  Yes.

3   Q.  Is there anything else?

4   A.  Yes.  Page 30, paragraph 30, in the middle of the paragraph

5   it states "on or about May 13, 2019, at the direction of

6   agents."  That date should be March 13, 2019.

7   Q.  And is there anything else?

8   A.  Yes.  Page 36, paragraph 39, towards the end of that

9   paragraph there's this:

10          "Barton transferred a total of approximately 13,519 of

11  the 515,161 into another IOLTA account held in the name of

12  Barton Law Firm LPA."

13          That wasn't an IOLTA account.  That was a business

14  checking account held in that same name.

15  Q.  So the correction is to the account type?

16  A.  Yes.

17  Q.  And was there anything else?

18  A.  No.

19  Q.  So with those corrections that you just advised the Court,

20  is the information contained in Government Exhibit 1 true and

21  accurate to the best of your knowledge?

22  A.  Yes.

23  Q.  Is the information contained in Government Exhibit 1 based

24  on a number of different sources?

25  A.  Yes.

1  Q.  What are some of those sources?

2  A.  Interviews of cooperating sources, interviews of witnesses,

3  financial records, intercepted communications, including phone

4  calls and text messages, a search warrant of an email account,

5  physical surveillance conducted by agents.

6  Q.  Were there drug seizures as part of this investigation?

7  A.  Yes.

8  Q.  Is the information in the affidavit also based on the

9  training and experience of law enforcement officers?

10  A.  Yes.

11  Q.  Will your testimony today be based on those sources that

12  you've just listed?

13  A.  Yes.

14  Q.  Based on your training and experience and knowledge of the

15  investigation, does the information appearing in the complaint

16  support probable cause that a crime has been committed by the

17  defendants listed in the complaint?

18  A.  Yes.

19          MS. BOGART:  Judge, objection.

20          MR. SALTZMAN:  I object as well.  It calls for a legal

21  conclusion.

22          THE COURT:  Overruled.

23          MS. BOGART:  Okay.  May I have the question again?

24          THE COURT:  Well, since we have no court reporter, I

25  guess you're asking him to restate the question.

1        MS. BOGART:  Okay.  Is there a recording of this?

2        THE COURT:  There is a recording, but you're not going

3    to get a playback.

4        MS. BOGART:  Yeah, okay.  I'm sorry.  Could you just

5    tell me what the question is again?

6        MR. McCROBIE:  Yes.  It was:  Based on your training

7    and experience and knowledge of the investigation, does the

8    information contained in Government Exhibit 1 support probable

9    cause that a crime was committed by the defendants listed in

10   this complaint?

11       MS. BOGART:  Okay.  In addition to the objection that

12   it's calling for a legal conclusion which this Court is here to

13   decide, I'm going to object because I think it's confusing in

14   what capacity he is testifying.  Is he testifying under a 701

15   basis, is he testifying under a 702 basis, or is he going to be

16   testifying in a dual capacity, in which case I think we ought

17   to have an appropriate foundation.

18       THE COURT:  The objection is overruled.  You may move

19   forward.

20   BY MR. McCROBIE:

21   Q.  Agent Villa, please turn to page 11 of the affidavit,

22   subsection (b).

23   A.  Okay.

24   Q.  What's discussed in this subsection?

25   A.  Mr. Bustamante coordinated with a Chicago-based

1  drug-trafficking organization to collect the repayment of money

2  owed regarding an 11-kilogram seizure of heroin that was

3  supplied by a Mexican source of supply.

4  Q.  Okay.  So did law enforcement officers make a drug seizure

5  on or about August 19th, 2017?

6  A.  Yes.

7  Q.  And what did they seize?

8  A.  Eleven kilograms of heroin.

9  Q.  Was there a cooperating source involved in that

10  transaction?

11  A.  Yes.

12  Q.  We'll call that individual CS1.  After that seizure, did

13  CS1 provide information about Erick Bustamante?

14  A.  Yes.

15  Q.  What did CS1 say?

16  A.  CS1 indicated that Mr. Bustamante was sent by the Mexico

17  source of supply to meet with the members that were based --

18  the Chicago-based drug-trafficking organization to collect the

19  repayment of $118,000 per member of the drug-trafficking

20  organization.

21  Q.  According to CS1, did Mr. Bustamante indicate how this

22  money was to be repaid?

23  A.  Yes.

24  Q.  What did Mr. Bustamante relate?

25  A.  Mr. Bustamante provided a bank account and routing number

1   for CS1 to make payments into.

2   Q.  Turning your attention to page 3, subsection (c), did

3   agents later approach the individual listed as the signatory on

4   that bank account?

5   A.  Yes.

6   Q.  And just to be clear, this is the bank account that

7   Mr. Bustamante told CS1 the payments should be made into --

8   A.  Yes.

9   Q.  -- as a result of the seizure of 11 kilograms of heroin?

10  A.  That's correct.

11  Q.  Did that person agree to cooperate with the investigation?

12  A.  Yes.

13          MS. BOGART:  Judge, who are we talking to now?

14  BY MR. McCROBIE:

15  Q.  You approached the individual who was the signatory on the

16  account, right?

17  A.  Agents approached the signer of the account, yes.

18  Q.  And that account is referred to in the affidavit as Company

19  A bank account?

20  A.  Yes.

21  Q.  Did the signatory of Company A bank account agree to

22  cooperate with the investigation?

23  A.  Yes.

24  Q.  Is that person indicated in the affidavit as CS2?

25  A.  Yes.

1  Q.  Was CS2 familiar with Erick Bustamante and Rick Owen?

2  A.  Yes.

3  Q.  Turning your attention to the top of page 14, what

4  information did CS2 provide about CS2's initial contact with

5  Mr. Bustamante?

6  A.  CS2 stated that one of CS2's associates, Mr. Owen,

7  introduced CS2 to Bustamante, and then through a series of

8  phone calls they made an arrangement for CS2 to accept cash

9  deposits into CS2's business bank account.

10  Q.  And what information did CS2 provide about what he did with

11  those cash deposits.

12  A.  CS2 stated that Mr. Bustamante and his associates provided

13  instructions for CS2 to wire transfer those, those funds.

14  Q.  Did CS2 indicate that at some point CS2 received a phone

15  call from an individual who referred to himself as Lalo?

16          MS. BOGART:  I'm going to object to the leading on

17  these conversations, Your Honor.

18          MR. SALTZMAN:  I join, Judge.

19          THE COURT:  I'll let the question stand, but watch the

20  leading; otherwise, those objections will be ruled in their

21  favor.

22          MR. McCROBIE:  Understood.

23  BY MR. McCROBIE:

24  Q.  What, if any, information did CS2 indicate about an

25  individual named Lalo?

1    A.  CS2 stated that Lalo had contacted CS2 and accused CS2 of

2    stealing money from Lalo.

3    Q.  Did CS2 indicate whether CS2 had a conversation with

4    Mr. Bustamante about that?

5    A.  Yes.

6    Q.  What did CS2 say?

7    A.  CS2 stated that approximately 1.8 million had been stolen

8    from Lalo and that Individual A was responsible for $1.5

9    million and that Mr. Bustamante was responsible for

10   approximately $300,000.

11   Q.  According to CS2, did Mr. Bustamante say anything about

12   working for Lalo in the future?

13   A.  Yes.  CS2 stated that Bustamante would do pickups and

14   drop-offs on their behalf in order to repay the debt.

15   Q.  Turning your attention to subsection (d) on page 17, what

16   does this section refer to?

17   A.  Mr. Bustamante and Mr. Owen recruited undercover DEA agents

18   to fly large quantities of narcotics and narcotics proceeds.

19          MS. BOGART:  And again, Judge, can we get a date and a

20   time and a place and who's present, please?

21          THE COURT:  Well, I think we're getting there.  He

22   just asked a very general question.

23   BY MR. McCROBIE:

24   Q.  Turning your attention to page 19 --

25          THE COURT:  Well, do you want to go back?  You had him

1  just talk about a heading, but are we going to talk about the

2  dates and the times?

3          MR. McCROBIE:  Yes.

4          THE COURT:  All right.  Go ahead.

5  BY MR. McCROBIE:

6  Q.  Agent Villa, was there a meeting involving Mr. Bustamante

7  and the undercover DEA agents?

8  A.  Yes.

9  Q.  When did that occur?

10 A.  That took place on January 30th, 2019.

11 Q.  Who attended that meeting?

12 A.  Mr. Bustamante was in attendance, another individual, and

13 the undercover pilots.  There was two undercover pilots.

14 Q.  Who facilitated that meeting?

15 A.  CS2 initially coordinated the meeting with Mr. Bustamante.

16 Q.  Was this meeting recorded?

17 A.  Yes.

18 Q.  What was the purpose of the meeting?

19 A.  Mr. Bustamante discussed with the undercover pilots the

20 pricing for flying large quantities of narcotics proceeds and

21 also for flying large quantities of narcotics.

22 Q.  And what parts of the conversation, again turning your

23 attention to the top of page 21, indicated that narcotics and

24 currency were being discussed?

25 A.  Mr. Bustamante stated that they were looking to carry 500

1  kilos.

2  Q.  Based on your training and experience, what does 500 kilos

3  refer to?

4  A.  The weight of narcotics.

5  Q.  Was --

6       MS. BOGART:  Can the record -- I'm sorry.  Can the

7  record reflect that whoever the other individual was that's

8  been unidentified is not Jery Barton?

9       THE COURT:  You will have an opportunity to

10  cross-examine.  So to the extent that that is important for you

11  to ask, you will be able to ask the question to the extent that

12  the rules allow for it.

13       You may proceed.

14  BY MR. McCROBIE:

15  Q.  Agent Villa, you also indicated that the transportation of

16  currency was discussed at this meeting?

17  A.  Yes.

18  Q.  What was -- tell us about that conversation.

19  A.  Mr. Bustamante indicated that he had coordinated movements

20  of such large amounts of currency that they didn't count the

21  currency, that they just talked about the weight of the

22  currency.

23  Q.  And does that appear on page 24 of the affidavit?

24  A.  Yes.

25  Q.  Specifically, what did Mr. Bustamante say?

1    A.  Well, Mr. Bustamante stated that for every 1 million in

2    $100 bills, it would weigh 22.4 pounds.

3    Q.  Later that day, turning your attention to pages 26 and 27,

4    was there a conversation between CS2 and Mr. Owen?

5    A.  Yes.

6    Q.  What was the subject of those conversations?

7    A.  They discussed Mr. Bustamante meeting with the pilots.

8    Q.  And looking at paragraph 23 on page 27, what did Mr. Owen

9    say regarding the meeting?

10   A.  I'm sorry.  Can you repeat that?

11   Q.  In paragraph 23, what did Mr. Owen say regarding the

12   meeting with the pilots?

13   A.  Mr. Owen stated that he thought they would just need to get

14   a domestic flight done right now.

15   Q.  During -- then kind of moving on, during communications

16   intercepted during this investigation did the name Lalo come

17   up?

18   A.  Yes.

19   Q.  Looking at page 29, paragraph 28, did CS2 provide

20   information about videos that he had received from

21   Mr. Bustamante?

22   A.  Yes, he did.

23   Q.  Can you describe what those videos showed?

24   A.  Yes.  One of the videos that CS2 had provided was

25   Bustamante opening up a package that contained United States

1    currency and then counting those, counting the currency out.

2    Q.  At the end of paragraph 28, does that describe something

3    that Bustamante can be heard saying on the video?

4    A.  Yes.  So Mr. Bustamante indicated that there was $2,000

5    missing from the package, and part of the counting out for Lalo

6    was to show Lalo that Mr. Bustamante didn't steal the $2,000,

7    that the packages were short.

8    Q.  Looking at page 31, paragraph 33, what does this paragraph

9    describe?

10   A.  This shows a phone call that was made on May 11, 2019, and

11   the participants were Mr. Bustamante, Mr. Owen, and Mr. Barton.

12   Q.  What was the subject -- what was one of the subjects of

13   this conversation?

14   A.  They discussed a transfer of approximately $35,000 from an

15   IOLTA account that was controlled by Mr. Barton.

16   Q.  Did Mr. Barton ask a question about the transaction?

17   A.  Yes, he --

18          MS. BOGART:  I'm just going to object, Judge, because

19   we are summarizing what are tape-recorded telephone calls.

20          THE COURT:  Yes, I understand that.  So your objection

21   is overruled.

22          You may proceed.

23          MR. SALTZMAN:  Judge, if I could ask, what paragraph

24   are we referencing?

25          THE COURT:  I believe we're on 33.

1          MR. McCROBIE:  The top of 32.

2          THE COURT:  The top of 32, paragraph 33.

3          MR. McCROBIE:  It's, yes, paragraph 33, pages 31 and

4  32.

5          THE COURT:  Yes.

6  BY THE WITNESS:

7  A.  So Barton stated or Mr. Barton stated:

8          "Okay.  So it's a bona fide transaction as far as you

9  know?"

10  BY MR. McCROBIE:

11  Q.  How did Mr. Bustamante respond?

12  A.  He stated:

13          "Yes, for supplies.  It's not like an actual salon."

14  Q.  What did -- did Mr. Barton ask another question?

15  A.  Yes, he asked:

16          "But is that a business that Lalo is in?"

17  Q.  And what was the response from Mr. Bustamante?

18  A.  Mr. Bustamante stated:

19          "Yeah, they do import and export.  That's what their

20  main thing is.  So they process payments for all kinds of

21  merchants.  So some merchants will do hemp like we've talked

22  about before.  Some companies do textiles.  Some people do

23  plastics, construction equipment, different things."

24  Q.  Other places in the investigation, have you seen instances

25  of Mr. Bustamante using the word "textiles"?

1    A.  Yes.

2    Q.  Where was that?

3    A.  During the undercover -- excuse me.  During the meeting of

4    Mr. Bustamante and the undercover pilots, Mr. Bustamante

5    explains to the undercover agents that they'll use the code

6    word "textiles" to describe narcotics.

7    Q.  Let's look at paragraph 35 on page 33.  What information is

8    in this paragraph?

9    A.  It's a phone call on June 7th, 2019, between Mr. Bustamante

10   and Mr. Owen.

11   Q.  What was discussed on this call?

12   A.  They discuss the repayment of the debt, a debt to Lalo.

13   Q.  What did Mr. Bustamante say?

14   A.  Mr. Bustamante stated that he was continuing to run errands

15   to pay down the debt.

16   Q.  Earlier in that paragraph, does Mr. Bustamante say

17   something about amounts that are owed?

18   A.  Yes.  He states that there was a total of 2 million that

19   had been taken from Lalo's group and, you know, that 300 grand

20   was Bustamante's responsibility.

21   Q.  And what else did he say in that exchange?

22   A.  About other people stealing funds also from Lalo.

23          MS. BOGART:  Judge, may I just have a continuing

24   objection to the summary of telephone communications which are

25   the subject of recordings?

1      MR. SALTZMAN:  I join in that, Judge.

2      THE COURT:  All right.  I will continue to overrule

3  those objections.

4      MS. BOGART:  (Inaudible.)

5  BY MR. McCROBIE:

6  Q.  Agent Villa, let's turn to page 98, subsection (9).

7      MS. BOGART:  Okay.  I got it.  Sorry.

8  BY MR. McCROBIE:

9  Q.  What's described in this subsection of the affidavit?

10  A.  This subsection describes Mr. Bustamante collecting

11  $160,000 of narcotics proceeds from an individual in

12  Birmingham, Alabama.

13  Q.  Could you summarize how that transaction began?

14  A.  Mr. Bustamante and Individual K first discussed the

15  transaction on a phone call.

16  Q.  And what was -- what information was in that phone call?

17  A.  Individual K used a code name for Mr. Bustamante, and

18  Mr. Bustamante indicated that he gets a lot of different codes

19  and names that he needs to confirm that he's discussing it with

20  the right person.

21  Q.  Did they discuss an amount during this phone call?

22  A.  Yes.

23  Q.  Where did they describe that?

24  A.  They described -- Individual K stated that he was guessing

25  the amount would be $150,000.

1    Q.  What did Mr. Bustamante -- what was Mr. Bustamante's

2    question that prompted that answer?

3    A.  He asked:

4              "How many units do you have?"

5    Q.  Turning to page 102, paragraph 171, what's described in

6    this paragraph?

7    A.  A phone call on May 14th, 2019, between Mr. Bustamante and

8    Mr. Barton.

9    Q.  What did they discuss on this phone call?

10   A.  They discussed Mr. Bustamante traveling to Birmingham to

11   collect the proceeds to Lalo.

12             MS. BOGART:  Your Honor, I'm going to object to the

13   characterization of the phone conversation.

14             THE COURT:  And you'll get to cross-examine him on his

15   characterization, so the objection is overruled at this stage.

16   BY MR. McCROBIE:

17   Q.  Specifically, what did Mr. Barton ask?

18   A.  Mr. Barton asked Mr. Bustamante:

19             "What are you doing in Birmingham?"

20   Q.  How did Mr. Bustamante respond?

21   A.  Mr. Bustamante said:

22             "Just doing a couple of rounds for Lalo."

23   Q.  What did Mr. Barton say after that?

24   A.  Mr. Barton replied:

25   :         "Okay.  Well, I hope it goes smoothly because there

1  isn't -- there is no money in yet."

2  Q.  Then going over to page 103, paragraph 175, did

3  Mr. Barton -- I'm sorry -- did Mr. Bustamante later meet with

4  an individual in Alabama?

5  A.  Yes.

6  Q.  How do we know that?

7  A.  Physical surveillance was conducted by agents, and there

8  was also intercepted phone calls.

9  Q.  What did the agents performing physical surveillance

10  observe?

11  A.  They observed a black Nissan Maxima registered to

12  Individual K, and that vehicle approached Mr. Bustamante.

13  Mr. Bustamante walked toward the passenger side with a

14  backpack, and then agents observed Individual K get out of the

15  vehicle and open the trunk.  Mr. Bustamante met that individual

16  at the rear of the car.  Agents also observed Mr. Bustamante

17  lean inside the trunk and then walk away from the car with his

18  backpack.

19  Q.  And continuing to paragraph 178, did law enforcement later

20  search a truck that Individual K was driving?

21  A.  Yes.

22  Q.  What did they find?

23  A.  Law enforcement officers discovered 16 kilograms of cocaine

24  and one kilogram of heroin.  They also found four cell phones

25  in the trunk.

1  Q.  Did law enforcement also execute a search warrant on

2  individual K's residence?

3  A.  Yes.

4  Q.  What did they find there?

5  A.  Agents found 2.2 kilograms of heroin, more than one

6  kilogram of cocaine, digital scales, six cellular phones,

7  approximately 108,000 in United States currency, one loaded

8  revolver, and a loaded AR-15 style rifle with a 60-round drum.

9  Q.  And based on your training and experience, what conclusions

10 do you draw from the presence of those items in the home?

11 A.  That this individual was a narcotics dealer.

12 Q.  Turning to page 108, subsection (11), what's described in

13 this section?

14 A.  Mr. Bustamante and Rick Owen -- excuse me.  Mr. Bustamante

15 with the assistance from Rick Owen deposited narcotics

16 proceeds, including the proceeds obtained from Individual K, at

17 a wire transfer business located in Chicago.

18 Q.  Was defendant Owen involved in this transaction?

19 A.  Yes.

20 Q.  How?

21 A.  He assisted with coordinating Mr. Bustamante's travel.

22 Q.  And is that explained in paragraphs 189 and 190?

23 A.  Yes, traveling from Nashville, Tennessee, to Chicago.

24 Q.  Did Mr. Bustamante arrive in Chicago on May 17th?

25 A.  Yes.

Villa - direct by McCrobie

1   Q.  And how did you confirm that?

2   A.  Surveillance was conducted on Mr. Bustamante.

3   Q.  Once he had arrived in Chicago, where did Mr. Bustamante

4   go?

5   A.  Mr. Bustamante went to the Cermak Market located on the

6   5200 block of South Pulaski Road in Chicago.

7   Q.  What did he do there?

8   A.  Mr. Bustamante approached Employee A at a wire transfer

9   business which was located in the Cermak grocery store, and

10  Mr. Bustamante handed the black and brown backpack to the

11  employee.

12  Q.  Did -- sorry.  Was there more?

13  A.  And the employee placed the bag in a safe marked CSU-30.

14  Q.  Did agents later -- is that employee referred to as

15  Employee A?

16  A.  Yes.

17  Q.  Did agents speak to Employee A?

18  A.  Yes.

19  Q.  What did Employee A tell the agents?

20  A.  Employee A stated that an individual that Employee A knew

21  as Erick had visited his store and dropped off packages on

22  three previous occasions.

23  Q.  Did Employee A explain how those transactions played out?

24  A.  Yes.  Employee A was provided instruction from an

25  individual the employee new as Oscar and that this individual

1  had controlled the safes remotely.  So Employee A couldn't

2  access the safes themselves, so Employee A would rely on this

3  other individual to open up the safes.

4  Q.  Was that individual onsite?

5  A.  No.

6  Q.  Did agents search the wire transfer business?

7  A.  Yes.

8  Q.  Did that search include a search of the safes?

9  A.  Yes.

10  Q.  What was found in the safe marked CSU-30?

11  A.  There was a --

12        MS. BOGART:  I'm sorry.  Can we have a date?  I'm a

13  little lost in the complaint here, so I'm trying to figure it

14  out.

15  BY MR. McCROBIE:

16  Q.  When Mr. Bustamante was in the wire transfer location on

17  May 17th, 2019, agents later did a search that day?

18  A.  Yes.

19  Q.  And what, if anything, did they find in the safe marked

20  CSU-30?

21  A.  Agents had found $156,610 in U.S. currency.

22  Q.  How was -- was that currency packaged in anything?

23  A.  Yes, it was the black and brown backpack.

24  Q.  The same one that Mr. Bustamante had been seen with?

25  A.  It appeared to be the same backpack.

```
1   Q.  Okay.  So you previously testified that defendant Owen
2   assisted Mr. Bustamante's travel to Chicago on May 17th,
3   correct?
4   A.  Yes.
5   Q.  And you also testified about defendant Owen's discussions
6   with CS2 about the meeting with the pilots?
7   A.  Yes.
8   Q.  I'd like to turn your attention to page 86.
9           MS. BOGART:  Are we going back now?
10          MR. McCROBIE:  We're going to page 86, yes.
11          MS. BOGART:  Okay.
12  BY MR. McCROBIE:
13  Q.  Paragraph 132.  Was that instance in May the only time that
14  defendant Owen made travel arrangements for Mr. Bustamante?
15  A.  No.
16  Q.  Is another one of those instances described in paragraph
17  132?
18  A.  Yes.
19  Q.  Can you explain that particular instance?
20  A.  Yes.  On April 25th, 2019, Mr. Bustamante spoke with
21  Mr. Owen on the phone and it was to discuss travel to Detroit.
22  Q.  During this conversation, did they discuss the purpose of
23  Mr. Bustamante's travel?
24  A.  Yes.
25  Q.  What was discussed?
```

1  A.  Mr. Owen had asked:

2       "Are you trying to put it in Huntington or anywhere?"

3       Then Mr. Bustamante replied:

4       "I have to give it to one of Lalo's contacts."

5  Q.  Based on your knowledge of the investigation, what did the

6  reference to Huntington refer to?

7  A.  It was in reference to a bank account controlled by

8  Mr. Barton.

9  Q.  At what bank?

10 A.  Huntington.

11 Q.  Was there another -- in addition to the undercover pilots,

12 was there another use of undercover agents in this

13 investigation?

14 A.  Yes.

15 Q.  What was that?

16 A.  It was another DEA agent acting in an undercover capacity

17 as a business owner.

18 Q.  And what was the purpose of the agent posing as a business

19 owner?

20 A.  Mr. Bustamante wanted to coordinate with the undercover

21 agent for the undercover agent to accept a cash deposit and

22 then wire those funds as instructed by Mr. Bustamante.

23 Q.  Going back to page 60, paragraph 79, what's described in

24 this paragraph?

25 A.  It's a phone conversation, a telephone conversation on

1   April 11th, 2019, between Mr. Bustamante and Mr. Owen.

2   Mr. Owen is discussing how much currency could be deposited

3   into the UC bank account per day, and then they discuss how

4   they'll start at a small amount and then increase the amount.

5   Q.  And based on your training and experience, what was the

6   need to follow that pattern?

7   A.   In order to evade detection by the bank's compliance

8   department.

9   Q.  And how would starting off with a smaller amount and

10  gradually increasing it achieve that goal?

11  A.   That would allow them to create a cover story for the

12  currency and then eventually increase it.

13          MR. SALTZMAN:   Judge, I object to that on the basis of

14  speculation.

15          THE COURT:   It will go to the weight, not the

16  admissibility, so go ahead.

17  BY THE WITNESS:

18  A.  By starting with smaller amounts and then increasing, it

19  wouldn't be a surprise to the bank that currency at that level

20  was being deposited.

21  BY MR. McCROBIE:

22  Q.  Now, is what you've testified to so far the only evidence

23  of defendant Owen's involvement in this conspiracy?

24  A.  No.

25  Q.  What is some of the other evidence?

1  A.  There was some other coordination of travel for

2  Mr. Bustamante for these narcotics proceeds pickups and

3  deposits either at bank accounts or wire transfer businesses.

4  There was also information that Mr. Owen had provided to

5  provide a cover story for banking activity, including cash

6  deposits.

7  Q.  Please turn to page 40.

8  A.  Okay.

9  Q.  Do you see subparagraph (b) in the middle of that page?

10  A.  Yes.

11  Q.  Is this an example of one of those origin stories you just

12  described?

13          MS. BOGART:  Page 40?

14          MR. McCROBIE:  Yes.

15  BY THE WITNESS:

16  A.  Yes.

17          MS. BOGART:  Can we have a paragraph?  I'm sorry.

18          THE COURT:  He's not at any paragraph yet.  He's just

19  asking him a general question.

20          MS. BOGART:  Okay.

21          THE COURT:  I think the question was:  Page 40, does

22  it include an example of the origin story?

23          MR. McCROBIE:  Yes.

24          THE COURT:  The answer was yes, I believe.  Is that

25  correct, agent?

Villa - direct by McCrobie

33

1     THE WITNESS:  Yes.

2     THE COURT:  Do you want to have him explain why it

3  provides an example so that we can all be told?

4     MR. McCROBIE:  Yes.

5  BY MR. McCROBIE:

6  Q.  So in subparagraph (b), what does subparagraph (b)

7  describe?

8  A.  Mr. Owen asked --

9  Q.  Well, first of all, who is Mr. Owen talking to in this

10  conversation?

11  A.  This is in regards to a call between Mr. Owen and

12  Mr. Bustamante on April 3rd, 2019.

13  Q.  Okay.

14  A.  Mr. Owen stated:

15        "Okay.  All right.  Now that's our stories about the

16  origins."

17        Bustamante responded.

18        "It's cannabis, but you know."

19        Then Mr. Owen stated:

20        "You can't say cannabis."

21        Mr. Bustamante then stated:

22        "I don't know.  Make something up and I'll follow

23  along."

24        Then Mr. Owen suggested "farm equipment," and

25  Mr. Bustamante said "sure."

1  Q.  Agent Villa, was defendant Barton formerly licensed to
2  practice law?
3  A.  Yes.
4  Q.  Is he currently licensed to practice law?
5  A.  No.
6  Q.  When did that change?
7  A.  Early April of 2019.
8  Q.  And what happened in early April?
9  A.  Mr. Barton resigned.
10 Q.  I'd like to turn your attention to page 41.  Beginning with
11 paragraph 50, what does paragraph 50 describe?
12 A.  This paragraph describes bank records for Mr. Barton's
13 IOLTA account at Huntington Bank.  On April 4th, 2019,
14 individual F deposited $34,400 in cash into Mr. Barton's
15 Huntington account.  Then the next day, Mr. Bustamante made a
16 cash deposit of $45,000 into this same Huntington account.
17 Q.  And then were there transactions on April 8th and April
18 9th?
19 A.  Yes.  Then there were transfers from the Huntington account
20 of $25,000 on April 8th to Company B bank account.  Then on
21 April 9th, 2019, there was a transfer of $22,000 to Company B
22 bank account.
23 Q.  During the investigation, have you seen other wire
24 transfers to the Company B account?
25 A.  Yes.

1   Q.  From what accounts?

2   A.  There was a wire transfer from the DEA undercover bank

3   account to Company B bank account.

4   Q.  And why did the undercover agent involved in the undercover

5   bank account transfer that money to Company B?

6   A.  Mr. Bustamante provided him the instructions to do that.

7   Q.  Going on to paragraph 51, can you describe the conversation

8   that's described here?

9   A.  Yes.  On April 9th, 2019, there was a phone call between

10   Mr. Bustamante and Mr. Barton, and during this conversation

11   Mr. Bustamante stated:

12         "Remember yesterday you sent over $25,000 to a Chase

13   account?  We need to finish off that client with 22 today."

14         Then Mr. Barton asked:

15         "Send another 22 to the same place, is that what

16   you're saying?"

17         Then Mr. Bustamante confirmed "yes."

18   Q.  Did they discuss the deposit by Individual F in this

19   conversation?

20   A.  Yes, Mr. Bustamante said:

21         "We had a dealer deposit 34,400, remember?"

22         Then Mr. Barton asked:

23         "Who is that exactly, by the way?"

24         Then Mr. Bustamante answered:

25         "It's a company that buys Bitcoins but also the

1  servers and all technology stuff."

2  Q.  Going back to page 48, paragraph 59 at the bottom of that

3  page, what does this paragraph describe?

4  A.  It's a telephone conversation between Mr. Bustamante and

5  Mr. Barton on May 20th, 2019.

6  Q.  What did they discuss?

7  A.  They discussed how to explain to the bankers at Huntington

8  the cash deposit activity that Individual F had conducted

9  there.

10      MS. BOGART:  I'm sorry.  Can you tell me the paragraph

11  again?

12      MR. McCROBIE:  It's paragraph 59 at the bottom of page

13  48 and continuing onto page 49.

14      MS. BOGART:  Okay.  Thank you.

15  BY MR. McCROBIE:

16  Q.  What did Mr. Barton ask Bustamante in this conversation?

17  A.  Mr. Barton asked Mr. Bustamante if the bank had decided to

18  run a background check on Individual F, would they find

19  anything bad, and Bustamante responded not to his knowledge.

20  Q.  What did Mr. Barton next ask?

21  A.  Mr. Barton asked:

22      "What is the relationship with Lalo?"

23      Then Mr. Bustamante responded:

24      "He is just one of his runners."

25      Then Mr. Barton responded:

1          "One of his runners.  You know, that's not what

2     Huntington wants to hear.  Is he a business associate in some

3     recognizable --"

4          Then Mr. Bustamante responded:

5          "He's an employee."

6     Q.  In the course of your investigation, did you interview

7     Mr. Barton on or about May 22nd?

8     A.  Yes.

9     Q.  What did you ask him during this interview?

10    A.  I had asked if Mr. Barton knew Individual F.

11    Q.  And turning your attention to page 50, paragraph 61, what

12    was Mr. Barton's response to that question?

13    A.  Mr. Barton stated that he was familiar with Individual F

14    but that Individual F was connected to a client and that

15    Mr. Barton couldn't discuss the matter any further other than

16    to say it was a fully lawful transaction.

17    Q.  Later that day, was there a conversation between Mr. Barton

18    and Mr. Bustamante?

19    A.  Yes.

20    Q.  Is that described in paragraph 62?

21    A.  Yes.

22    Q.  What was said during this conversation?

23    A.  Mr. Barton stated:

24         "Now we have another event that I'm not too happy

25    about and you won't be either.  First thing in the morning --

1 first thing this morning in the office, two men showed up from

2 criminal investigation unit of the IRS and they were asking

3 questions about things that are not a problem at all. Then as

4 they're wrapping up they said what do you know about Fernando,

5 Individual F, and I said I know who he is and that's a client

6 matter and I'm not able to share any information, and they said

7 okay, fine, folded up their notebooks and left."

8 Q. Did Mr. Barton tell Mr. Bustamante anything else about what

9 Mr. Barton told you or did not tell you?

10 A. Yes. So Mr. Barton stated:

11 "So I told him nothing. I did not give them your

12 name, Lalo's name, anybody's name, but I am concerned. And by

13 the way, I called the Pelican Bay branch at Huntington so that

14 they would not be requesting them to accept cash deposits per

15 yesterday's discussion."

16 Q. Turn to page 52, please, paragraph 65. What does paragraph

17 65 discuss?

18 A. This is a phone call between Mr. Bustamante and Mr. Barton

19 on June 10th, 2019.

20 Q. What was discussed during this phone call?

21 A. Mr. Bustamante was telling Mr. Barton that Individual F was

22 in Boston and that agents with the U.S. Department of Homeland

23 Security had seized $72,000 from Individual F.

24 Q. And remind us again who Individual F is, not his identity

25 but --

1    A.  That's the same individual that made the currency deposit

2    into Mr. Barton's Huntington Bank account.

3    Q.  Now, is what you've testified to so far the only evidence

4    of Mr. Barton's involvement in the conspiracy?

5    A.  No.

6    Q.  What other types of evidence is there?

7    A.  There's other financial activity, including wire deposits

8    and wire transfers out of accounts controlled by Mr. Barton.

9    Q.  Are there other communications between Mr. Barton and the

10   co-defendants?

11   A.  Yes.

12   Q.  Including emails?

13   A.  Yes.

14   Q.  Agent Villa, did any of the financial -- well, you already

15   testified about a May 17th transaction at the Wire Transfer

16   Business A in Chicago, correct?

17   A.  Yes.

18   Q.  Was that the only transaction that occurred in the Northern

19   District of Illinois?

20   A.  No.

21   Q.  Give us some examples of others.

22   A.  Mr. Bustamante made a currency deposit into a Huntington

23   Bank branch located in Oak Lawn, Illinois, and it was into an

24   account controlled by Mr. Barton.  CS1 had met with

25   Mr. Bustamante and provided him currency, and Mr. Bustamante --

1    and that CS deposited currency into another bank branch located

2    in the Northern District of Illinois.

3    Q.  When was that CS1 transaction?

4    A.  I believe that was the end of August 2017.

5              MR. McCROBIE:  I have nothing further, Your Honor.

6              THE COURT:  All right, cross-examination.  Who wants

7    to go first?

8          (Discussion off the record.)

9              THE COURT:  All right, Ms. Bogart on behalf of

10   Mr. Barton.

11             MS. BOGART:  On behalf of Mr. Barton, yes, Judge.

12                        CROSS-EXAMINATION

13   BY MS. BOGART:

14   Q.  So, Agent Villa, I represent Jery Barton, and my question

15   to you is this.  The complaint in paragraph 5(c) -- I don't

16   have the page, but let me find the page.  Page 3 -- no page 4,

17   5(c).  That allegation says that Mr. Barton is Ohio-based,

18   correct?

19   A.  Yes.

20   Q.  And, in fact, Mr. Barton never left Ohio in connection with

21   any of the activities that you've discussed or that are in this

22   complaint, did he?

23   A.  I don't know where Mr. Barton was physically located

24   throughout this investigation.

25   Q.  Well, didn't you visit him in Ohio?

1   A.  Yes.

2   Q.  Okay.  And you visited him at his office.

3   A.  Yes.

4   Q.  And the investigators also determined where his residence

5   was.

6   A.  There was some indication of where his residence was, yes.

7   Q.  Also in Ohio.

8   A.  Yes.

9   Q.  And these bank accounts that he opened were opened in Ohio.

10   A.  I don't know exactly where the bank accounts were opened.

11   Q.  You didn't, you didn't discover that in the course of your

12   investigation into the financials?

13   A.  I would have to look at the signature cards to see if there

14   was any indication of where they were physically opened.

15   Q.  Okay.  Well, the Chase IOLTA account number 1 that you

16   alleged Mr. Barton opened is a bank account that an attorney

17   has, correct, an IOLTA account?

18   A.  Yes.

19   Q.  Okay.  And those are specific to attorneys.

20   A.  Yes, that's my understanding.

21   Q.  Right.  And you know that Mr. Barton was licensed to

22   practice in the state of Ohio up through the time that he

23   retired in April of 2019.

24   A.  Yes.

25   Q.  And you also allege in this complaint that he was not

Villa - cross by Bogart

42

1  licensed to practice in any other state that you're aware of.

2  A.  Yeah, I was not aware that he was licensed anywhere else.

3  Q.  All right.  So are you aware that IOLTA accounts are opened

4  in the state where the attorney is practicing?

5  A.  I'm not aware of that.

6  Q.  You're not.  Okay.  That would be true where we have a

7  Chase IOLTA account number 1.  We have a Chase IOLTA account

8  number 2, and the same rule would apply to that.  We have a

9  Huntington IOLTA account.  Then we have a Huntington law firm

10  account.  These are your descriptions.  Then we have a

11  Huntington Compliance Paymaster account.  Are you aware that

12  the Huntington Bank is Huntington Bank of Ohio?

13  A.  I'm not sure where they're headquartered, Huntington Bank.

14  Q.  I didn't ask about headquarters.  It's called the

15  Huntington Bank of Ohio, isn't it?

16  A.  I don't know their full -- my understanding is it's the

17  Huntington Bank.

18  Q.  All right.  Did you understand that these accounts were

19  located in Ohio?

20  A.  Where they were opened?

21  Q.  Yeah, where they were opened.

22  A.  I don't know.  I'll have to check the signature cards for

23  those accounts.

24  Q.  Do you have those signature cards?

25  A.  I do, not present with me, but I have obtained them.

1    MS. BOGART:  Okay.  Well, Judge, I'm going to ask that

2   they produce those.

3         THE COURT:  Is there any objection to the production

4   of the signature cards?

5         MR. McCROBIE:  Yes, Your Honor.  It's not relevant to

6   these proceedings.  If the case proceeds to indictment, the

7   Government will, of course, produce everything under Rule 16.

8         MS. BOGART:  Well, it's hard to --

9         THE COURT:  Under what theory do you have at this

10  stage of the prosecution that you would be entitled to that

11  type of discovery?

12        MS. BOGART:  Well, because Mr. Barton's activity --

13        THE COURT:  I'm not asking about argument.  I'm asking

14  under what basis.

15        MS. BOGART:  Well, because under the money laundering

16  statute he's being charged with concealing the proceeds of

17  narcotics activity, and we are arguing that he was merely

18  present, meaning he wasn't a participant, as my questions will

19  show.

20        THE COURT:  I understand the argument you intend to

21  raise.  I'm asking under what, under what legal basis do you

22  have to have that type of discovery at this stage.

23        MS. BOGART:  Well, on venue, Judge.  There's no venue

24  in the Northern District of Illinois over Mr. Barton as far as

25  this.

1           THE COURT:  On a conspiracy charge?

2           MS. BOGART:  Exactly.  Under money laundering, under

3   the concealment money laundering statute, the activities of the

4   narcotics --

5           THE COURT:  So, again, if you are correct, you

6   wouldn't need that information because we don't have any actual

7   testimony from the agent about it.  He doesn't know at this

8   stage whether or not, so you get to make that argument, don't

9   you, because there's an absence of evidence here?

10          MS. BOGART:  Well --

11          THE COURT:  I'm asking you.  You generally aren't

12  entitled to discovery at this stage.

13          MS. BOGART:  Yeah, but I'm not asking for discovery.

14  Venue is a jurisdictional issue, and it goes --

15          THE COURT:  You're asking for discovery at this stage

16  to challenge venue.  The issue is under what basis do you have

17  to request that information, under what legal rule or statute.

18          MS. BOGART:  Well, under the legal rule or statute

19  that there would be an absence of probable cause to hold

20  Mr. Barton in Illinois on this complaint.

21          THE COURT:  All right.  So the Court rules that you do

22  not have to provide that information.  You can make that

23  argument even with the evidence that you have before you.

24          MS. BOGART:  Okay.

25  BY MS. BOGART:

1  Q.  Now, in this complaint, you alleged that Mr. Barton opened

2  these accounts at the direction of Mr. Bustamante, correct?

3  A.  Yes.

4  Q.  Okay.  But, in fact, the activities in this complaint begin

5  in, I think, 2017, August of 2017, correct?

6  A.  Yes.

7  Q.  And several of these accounts were opened prior to August

8  of 2017, isn't that right?

9  A.  Yes.

10 Q.  Okay.  Do you have any specific facts to suggest that when

11 they were opened prior to 2017, August of 2017, that they were

12 done at the direction of Mr. Bustamante?

13 A.  I would have to look at the line sheets to review

14 conversations between Mr. Barton and Mr. Bustamante.

15 Q.  Yeah, but I'm talking about before August of 2017.  So, for

16 example, I mean, even in your own complaint, the Huntington

17 IOLTA bank account was opened in August of 2013, and that's

18 alleged in, I believe, paragraph 48(a) of your complaint.

19 Well, let me check.  I don't know if that's correct.  Let me

20 just find that allegation.

21        (Brief pause.)

22            MS. BOGART:  Forgive me, Judge.

23        (Brief pause.)

24 BY MS. BOGART:

25 Q.  You don't recall offhand, do you, agent?

1  A.  So there's one that -- this refers to Huntington Bank and

2  Bank of America.  There was a Huntington Bank account that was

3  opened during the investigation, and there was also a bank

4  account at Bank of America that was opened during the

5  investigation.

6  Q.  Okay.  But we're talking about six separate accounts at

7  least that you identified in your complaint.  So you're saying

8  two of those six or seven accounts were opened during the

9  investigation, and that's all.  That's the best of your

10 knowledge?

11 A.  Yes.  It says "opened bank accounts at multiple financial

12 institutions, including Huntington Bank and Bank of America."

13 Q.  Okay.  Well, one of these accounts that you identify in

14 your investigation that was opened -- and it was an IOLTA

15 account -- was, in fact, opened in 2013, correct?

16 A.  That's correct.

17 Q.  Okay.  You have no knowledge of any connection between

18 Mr. Bustamante and Mr. Barton --

19 A.  No.

20 Q.  -- at that time, nothing alleged in this complaint.

21 A.  I don't.

22 Q.  Okay.  With respect to the opening of accounts, did you

23 talk to any banks to ask them why, for example, they were

24 closed and new ones opened?

25 A.  Can you repeat the question, please?

1  Q.  Well, did your investigation disclose that certain accounts
2  were closed?
3  A.  I'd have to look at the complaint for that information.
4  Q.  Okay.  So you can't as you sit here testify to the dates
5  that various of these accounts were closed.
6  A.  I don't know that.
7  Q.  And the reasons that new accounts were opened.
8  A.  I would have to refer to the complaint for that
9  information.
10  Q.  Okay.  You didn't become aware of -- well, okay.  Well, can
11  you look at it and tell me if you see anything in there that
12  explains why the banks closed some of these accounts and then
13  opened new ones?
14  A.  I can search.
15          THE COURT:  Do you have -- as you sit here, do you
16  recall in your reading of the complaint or in any other
17  information anything that would answer the question that is
18  posed by Ms. Bogart?
19          THE WITNESS:  I can't recall that.
20  BY MS. BOGART:
21  Q.  Okay.  Now, did you analyze -- Mr. Barton didn't make any
22  deposits into any of his accounts that are at issue in this
23  complaint, did he?
24  A.  Can you ask that question again?
25  Q.  Mr. Barton, he did not deposit any of the funds that you

1  are discussing in this complaint into his bank account.

2         THE COURT:  Do you mean that he physically wasn't the

3  one depositing?

4         MS. BOGART:  Right.

5         THE COURT:  Do you understand?

6  BY MS. BOGART:

7  Q.  He wasn't the source of the funds?

8  A.  Are you indicating currency deposits?  Wire transfers?  I'm

9  not -- there was quite a bit of activity in multiple accounts,

10 like you had stated.

11 Q.  Exactly.  But all I'm saying is that with respect to these

12 narcotics proceeds that you are describing in this complaint

13 and that you testified to, Mr. Barton didn't deposit any of

14 those into these accounts that he controlled, did he?

15 A.  Not to my knowledge.

16 Q.  Okay.  His sole activity was to transfer, to wire transfer

17 funds out of these bank accounts, right?

18 A.  I wouldn't describe it as "sole activity," no.

19 Q.  Well, with respect to these bank accounts, his financial

20 transactions that you were describing earlier.

21 A.  Yeah, he opened the accounts.  He maintained the accounts.

22 He maintained the relationship with the bank and I guess

23 provided whatever information they needed to the compliance

24 department and also wire transferred funds.

25 Q.  Okay.  Well, tell me on what occasion did he provide

 1  compliance information for a bank account to a bank in

 2  connection with any of the transactions in this complaint?

 3  A.  They're described in the complaint, defined in the

 4  complaint.

 5  Q.  Okay.  Well, can you tell me where that's described?

 6  A.  It will take me a second to find it.

 7      (Brief pause.)

 8  BY THE WITNESS:

 9  A.  I found an example.

10  BY MS. BOGART:

11  Q.  Okay.

12  A.  Page 45, paragraph 57, a phone conversation on April 22nd,

13  2019, between Mr. Bustamante and Mr. Barton.

14  Q.  Page 45?

15  A.  Yes.

16  Q.  Okay.  Well, according to your summary, he was informed

17  from a bank that there was a compliance issue with one of his

18  issues -- with one of his accounts.

19  A.  That's correct.

20  Q.  And the compliance issue related to deposits, correct?

21  A.  Yes.

22  Q.  But those weren't deposits that Mr. Barton made?

23  A.  They were not, no.

24  Q.  Okay.  And what he's describing here is that he needs --

25  that the bank is looking to get some information as to what the

1    source of the funds are, correct?

2    A.  Yes.

3    Q.  Okay.  Does that -- that summary does not describe

4    Mr. Barton as preparing the compliance documents, does it?

5    A.  It states:

6             "We can wordsmith something."

7    Q.  Yeah, okay.  That's his intention to do something, but

8    you're not talking about specific compliance, meetings with

9    banks, in this particular paragraph.

10   A.  Yeah, they're discussing putting a summary about the

11   deposits together.

12   Q.  Okay.  Describing the purposes of the deposits, right?

13   A.  Yes.

14   Q.  Okay.  Or the source.

15   A.  Yes.

16   Q.  Now --

17   A.  And this is after the fact, yes.

18   Q.  Pardon me?

19   A.  This is after the deposits were already made.

20   Q.  After the deposits were already made.

21   A.  Earlier in the month, yes.

22   Q.  Right.  Okay.  Insofar as the Chase IOLTA account number 1,

23   the Chase IOLTA account number 2, the Huntington IOLTA account

24   number 3, and number 4, the Huntington law firm account, those

25   four accounts are common accounts for a lawyer, correct?

1  A.  I don't know what are common accounts for a lawyer, but

2  IOLTA accounts are a lawyer's account.

3  Q.  And one says a law firm account.  So it says that's what

4  the purpose is.

5  A.  Sure, it's a business account, yes.

6  Q.  And did you see the discussions in these discussions in

7  which Mr. Bustamante was consulting with Mr. Barton as his

8  attorney?

9  A.  Do you have a -- I'd have to refer to the complaint.

10 Q.  Okay.  Well, you're aware -- are you aware that

11 Mr. Bustamante consulted with Mr. Barton in Mr. Barton's

12 capacity as an attorney?

13        MR. McCROBIE:  Objection to the form of the question.

14        THE COURT:  Do you want to point out something

15 specific that he can address?

16        MS. BOGART:  Well, I may get to that, yeah, but I'm

17 just asking if he was aware in listening to these conversations

18 or reviewing them where Mr. Bustamante says that

19 Mr. Barton references him as his attorney.

20 BY THE WITNESS:

21 A.  I would have to review the complaint or review the line

22 sheets for the conversations.

23 Q.  And are you aware --

24        THE COURT:  As you sit here, do you have any memory of

25 any information that you can recall where Mr. Bustamante and

1  Mr. Barton are specifically talking and there's an indication

2  that they are doing so as an attorney and as a client?

3          THE WITNESS:  I don't have a recollection right now.

4  BY MS. BOGART:

5  Q.  Well, do you recall a conversation about legal cannabis,

6  that is, cannabis being grown in the state of California?

7          MR. McCROBIE:  Your Honor, I object to this line of

8  questioning.  It goes beyond the scope of this hearing.

9          THE COURT:  What is the purpose of the discussion

10 around a purported attorney-client relationship?

11         MS. BOGART:  Because that's one of the questions that

12 they asked Mr. Barton.

13         THE COURT:  I mean, how does it address the probable

14 cause issues that we have?

15         MS. BOGART:  Well, they reference it in the complaint.

16         THE COURT:  And as you correctly noted, there's lots

17 of surplusage in the complaint.  So this particular line of

18 questioning, how would it relate to the issues of probable

19 cause?

20         MS. BOGART:  Well, let me ask.  Maybe I can ask the

21 agent.

22 BY MS. BOGART:

23 Q.  Do you recall the conversation in which Mr. Bustamante is

24 asking Mr. Barton if he understands the compliance issues for

25 proceeds of lawful marijuana businesses?

Villa - cross by Bogart

53

1  A.  I would have to review the complaint.

2  Q.  You don't recall that?

3  A.  I'd have to review the complaint for that information.

4         THE COURT:  As you sit here, you don't recall, yes or

5  no?

6         THE WITNESS:  There was discussion of cannabis.

7  Whether it was legal or illegal or the specifics, I can't

8  really recall those specifics.

9  BY MS. BOGART:

10 Q.  Well, you recall that during the time frame of this

11 complaint growing marijuana in the state of California became

12 legal.

13        MR. McCROBIE:  Objection again, Your Honor.

14        THE COURT:  I'm not sure where this is going in terms

15 of the probable cause issues for the offense that is charged.

16 BY MS. BOGART:

17 Q.  Well, all right.  Let me ask you this.  Is there any

18 reliance by the Government on this conversation where

19 Mr. Bustamante is discussing with Mr. Barton what the

20 compliance issues are for people who have lawful marijuana

21 businesses and the banking community?

22        MR. McCROBIE:  I'm going to object again, Your Honor.

23        THE COURT:  I guess I'm not sure what you're asking.

24 Are you saying that if there is an attorney-client relationship

25 that the Court can't rely on the information today?

1        MS. BOGART:  No, I'm asking whether the agent is --

2        THE COURT:  I'm asking you what's the point of this

3   line of questioning.

4        MS. BOGART:  Because I think that the conversation, to

5   the extent that Mr. Barton is discussing cannabis, it is in the

6   context of legal marijuana, not illegal marijuana, and it is in

7   the context of Mr. Bustamante asking for legal advice as to how

8   proceeds of the legal marijuana business is being handled

9   within the banking community.

10       THE COURT:  All right.  You may answer the question to

11  the extent you understand it.

12  BY THE WITNESS:

13  A.  Can you rephrase the question?  Let's not say rephrase.

14  Can you restate the question?

15  BY MS. BOGART:

16  Q.  Yes.  So do you recall the conversation where

17  Mr. Bustamante is asking Mr. Barton for advice about the legal

18  marijuana business and how the proceeds of that business are

19  being handled within the banking community?

20       THE COURT:  It might help me to focus on this if you

21  can provide the Court with the paragraph reference.

22       MS. BOGART:  Yeah.

23       THE COURT:  The page and paragraph reference.

24       MS. BOGART:  I'm sure it would.

25      (Brief pause.)

1   BY MS. BOGART:

2   Q.  Okay.  So turning to paragraph 36, it's referencing --

3          THE COURT:  And this is page 33?

4          MS. BOGART:  I'm sorry.  Paragraph 36.

5          THE COURT:  No, no, you were correct.  You said

6   paragraph 36.

7          MS. BOGART:  Paragraph 36, page 33.

8          THE COURT:  All right.

9   BY MS. BOGART:

10  Q.  It's referencing a telephone call on August 9th, 2019,

11  session 15367.  Do you see that?

12  A.  Yes.

13  Q.  In this summary paragraph, you say:

14         "During the conversation, they discussed a method for

15  laundering narcotics proceeds through the banking system."

16         Do you see that?

17  A.  Yes.

18  Q.  Okay.  So I'm going to hand you a copy of the conversation,

19  a transcript of the conversation, even though I haven't heard

20  the conversation myself, just based on the transcript that was

21  provided.

22         MR. McCROBIE:  Your Honor, I'd ask for a copy as well.

23         THE COURT:  Yes, of course.

24         MS. BOGART:  I don't have two copies.

25         THE COURT:  Well, you have to give a copy or show a

1    copy to the Government first.

2         MS. BOGART:  I'd be happy to show what I'm showing

3    him.

4         MR. McCROBIE:  Which section?

5         (Discussion off the record.)

6    BY MS. BOGART:

7    Q.  Let me show you what I'll mark as Barton Exhibit 1.  It's a

8    transcript of a call between Bustamante and Mr. Barton on

9    August 9th, 2019, number 15367 as referenced in paragraph 36 of

10   the complaint.  Do you see that transcript, agent?

11        THE COURT:  He's reviewing the document.

12   BY MS. BOGART:

13   Q.  Oh, you're reviewing it.  That's fine.

14   A.  Okay.  I just located the section, yeah.

15   Q.  Okay.  So you are familiar with documents that look like

16   this which are called line sheets --

17   A.  Yes.

18   Q.  -- summarizing some of the recorded conversations that took

19   place during this investigation, is that right?

20   A.  Yes.

21   Q.  Okay.  In your paragraph 36, you recite this as being a

22   conversation involving a method for laundering narcotics

23   proceeds, correct?

24   A.  The paragraph describes it as such, yes.

25   Q.  Right.  So laundering narcotics proceeds, though, that

1  would mean they would have to be unlawful proceeds to be part

2  of a laundering claim, correct?  You can look at me.  If you

3  don't know, you can say you don't know.

4  A.  Yeah, part of money laundering would be a specified

5  unlawful activity, yes.

6  Q.  Right.  Okay.  So depositing the proceeds of legal

7  marijuana would not be unlawful, specified unlawful activity,

8  would it?

9          MR. McCROBIE:  Objection, Your Honor.

10          THE COURT:  Basis?

11          MR. McCROBIE:  To the extent that it calls for a legal

12  policy conclusion.

13          THE COURT:  Well, he said probable cause, so I will

14  overrule the objection.

15          You can answer to the extent you know.

16  BY THE WITNESS:

17  A.  Can you restate the question, please?

18  BY MS. BOGART:

19  Q.  Well, if you're depositing money that's derived from the

20  sale, the lawful sale of marijuana, that would not be specified

21  unlawful proceeds.

22  A.  No, it would still be considered narcotics proceeds from

23  the federal statute because it's illegal federally.

24  Q.  But you're not laundering anything that's unlawful if it's

25  derived from a lawful business, are you?

1          MR. McCROBIE:  Objection, asked and answered.

2          THE COURT:  Yes, he responded that he believes it's

3    unlawful under federal law.  What happens in California would

4    be unlawful under federal law.

5          THE WITNESS:  That is correct, yes.  That's my

6    understanding.

7    BY MS. BOGART:

8    Q.  Okay.  But what they're talking about here, what Mr. Barton

9    is talking about here is about legal marijuana, correct?

10         MR. McCROBIE:  Objection.  Again, this is all

11   cumulative on the same topic.

12         THE COURT:  Yes, sustained.

13         MS. BOGART:  Well, as long as he says yes, I mean --

14         THE COURT:  Sustained.  I guess you want whether it

15   says the word "legal."

16         THE WITNESS:  In the document?

17         THE COURT:  In the transcript.

18         THE WITNESS:  Oh, in the transcript?

19   BY MS. BOGART:

20   Q.  You can look down 10-ish, and it says "Jery" and begins

21   with "it's got be large enough."

22   A.  "It's got to be large enough"?

23   Q.  Yeah.  "And it's got to be a place where they" --

24   A.  "Which would be in one of the states where cannabis is

25   legal and has been legal for awhile," is that what you're

1    saying?

2    Q.  Right, right.  But your paragraph 36 doesn't say that, does

3    it?

4    A.  My paragraph 36?

5              THE COURT:  It's on page 34, correct?

6              MS. BOGART:  33 through 34.

7              THE COURT:  The top of page 34.

8    BY THE WITNESS:

9    A.  It says it on 34.

10   BY MS. BOGART:

11   Q.  Right.  It says in (b) that they're talking about cannabis

12   growers in California, but it doesn't say anything about the

13   fact that it's legal to grow and sell marijuana in California,

14   does it?

15   A.  In paragraph 36?

16   Q.  So (b).  Well, I guess it does up above.

17   A.  Yes, "which would be in one of the states where cannabis is

18   legal," the same language as the line sheet.

19             THE COURT:  I'm going to have a pause here.  I did not

20   anticipate that we would go longer than a couple of hours, so

21   we're going to have to continue this matter.  What's the

22   requested continuation date?  I have until, I think, next

23   Thursday, the 21st, from the time of arrest for probable cause,

24   so we can come back on Tuesday.

25             MS. BOGART:  I think I can't do Tuesday.

1          THE COURT:  On Wednesday?

2          THE WITNESS:  Can I check my phone?

3          THE COURT:  I was going to say no because you just do

4   what I say, but yes, you may.  You may check.

5          We can have it on the 13th at 11:00.  I have one

6   matter.  No, actually I cannot do it at 11:00.  I may be able

7   to do it at 2:00 on the 13th.

8          MR. McCROBIE:  Your Honor, I have a sentencing at

9   2:00.

10         THE COURT:  Okay.  So Monday is a holiday.  Tuesday is

11  not available.  Is there --

12         MR. McCROBIE:  I'm sorry.  The date, are we talking

13  about the 12th or the 13th?

14         THE COURT:  I was talking about the 13th because

15  Ms. Bogart is unavailable on Tuesday.

16         MR. McCROBIE:  Oh, yes, I do have a sentencing on the

17  13th.

18         THE COURT:  All right.  So we can do it on the 14th,

19  which is the 21st day.  I was going to suggest that I was going

20  to allow the parties to submit written closing statements in a

21  sense to argue whatever legal basis you'd like, but that would

22  take us beyond the 21 days.  Is there any objection to going --

23  well, we'll have it done on the 14th, but I won't make a

24  decision on the 14th until I get some briefs from the parties.

25         MS. BOGART:  Yeah.

1           THE COURT:  No objection to that?

2           MS. BOGART:  No objection.

3           MR. SALTZMAN:  When on the 14th, Judge?

4           THE COURT:  We could do it at 11:00 on the 14th.

5           MS. BOGART:  I'm available.

6           MR. SALTZMAN:  That's fine, Judge.

7           THE COURT:  All right.  So I would anticipate we would

8     finish up with testimony on the 14th.  We will then have a

9     short briefing schedule for your closing argument briefs where

10    you can make your legal arguments from the defense standpoint

11    on any of the issues you want to raise.

12          MS. BOGART:  Judge, this would be written?

13          THE COURT:  Written, right.

14          MS. BOGART:  Okay.

15          THE COURT:  All right.  So we're going to adjourn the

16    preliminary examination at this stage.  I didn't ask you if you

17    were available, but I'm hereby ordering you to return to this

18    courtroom on November 14th at 11:00 a.m.

19          MR. McCROBIE:  Your Honor, could I just get Mr. Owen's

20    non-objection clear for the record on the change of time?

21          MR. SALTZMAN:  Oh, I'm sorry.  There's no objection

22    from me.

23          THE COURT:  I thought he said that.  I was going to

24    hold him to it because I heard him say that it's fine, but all

25    right.

Villa -

1        MR. SALTZMAN:  I can be as formal as I need to be,
2   Judge.
3        THE COURT:  I understand.  Thank you very much.  We'll
4   reconvene next week.
5        (Proceedings adjourned to November 14th, 2019, 11:00 a.m.)
6
7                    C E R T I F I C A T E
8        I, Patrick J. Mullen, do hereby certify that the
9   foregoing is an accurate transcript produced from an audio
10  recording of the proceedings had in the above-entitled case
11  before the Honorable MARIA VALDEZ, one of the magistrate judges
12  of said court, at Chicago, Illinois, on November 7, 2019.
13
14                          /s/ Patrick J. Mullen
                            Official Court Reporter
15                          United States District Court
                            Northern District of Illinois
16                          Eastern Division
17
18
19
20
21
22
23
24
25