<pre>
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3
   UNITED STATES OF AMERICA,        )  Nos. 19 CR 733-1
4                                   )       19 CR 733-2
                vs.                 )       19 CR 733-3
5                                   )
   ERICK BUSTAMANTE, RICK OWEN, and )
6  JERY BARTON,                     )  Chicago, Illinois
                                    )  November 14, 2019
7               Defendants.         )  11:10 a.m.

8                 TRANSCRIPT OF PROCEEDINGS
9       BEFORE THE HON. MARIA VALDEZ, MAGISTRATE JUDGE

10
   APPEARANCES,
11
   For the Government:   MR. MATTHEW J. McCROBIE
12                       United States Attorney's Office,
                         219 South Dearborn Street, Room 500,
13                       Chicago, Illinois  60604

14
   For Defendant
15 Rick Owen:            MR. STEVEN SALTZMAN
                         Steven Saltzman, Attorney at Law,
16                       200 South Michigan Avenue, Suite 201,
                         Chicago, Illinois  60604
17
   For Defendant
18 Jery Barton:          MS. SUSAN BOGART
                         Law Offices of Susan Bogart,
19                       111 West Jackson Boulevard, Suite 1700,
                         Chicago, Illinois  60604
20

21

22
                       PATRICK J. MULLEN
23                   Official Court Reporter
                  United States District Court
24           219 South Dearborn Street, Room 1412
                   Chicago, Illinois  60604
25                     (312) 435-5565
</pre>

1           THE CLERK:  19 CR 733, Defendant 2, United States of

2  America versus Rick Owen, preliminary examination hearing

3  continued; 19 CR 733, Defendant 3, United States of America

4  versus Jery Barton, preliminary examination hearing continued.

5           MR. McCROBIE:  Good morning, Your Honor.  Matt

6  McCrobie on behalf of the United States.

7           MR. SALTZMAN:  Good morning, Your Honor.  Steve

8  Saltzman on behalf of Rick Owen, and his appearance has been

9  waived for today.

10          THE COURT:  Yes.

11          MS. BOGART:  Susan Bogart on behalf of Jery Barton,

12  and he's present in court, Judge.

13          THE COURT:  All right.  So I believe we had Special

14  Agent Villa on cross-examination by Ms. Bogart, is that

15  correct?

16          MR. McCROBIE:  Correct.

17          MS. BOGART:  Yes.

18          THE COURT:  All right.  So if you can come up and take

19  the witness stand again, we will readminister the oath just for

20  the record.

21          THE CLERK:  Raise your right hand, sir.

22     (Witness duly sworn.)

23          THE CLERK:  You may be seated.

24          THE COURT:  Whenever you are ready, Ms. Bogart.

25          MS. BOGART:  Thank you, Judge.

1    JOSEPH VILLA,

2    GOVERNMENT'S WITNESS, PREVIOUSLY DULY SWORN,

3    CROSS-EXAMINATION (Resumed.)

4    BY MS. BOGART:

5    Q.  Agent Villa, last Thursday on November 7th, we were talking

6    about the location of the bank accounts for Mr. Barton, and you

7    didn't recall at that time from your investigation into

8    financial records where those accounts were located.  Did you

9    have a chance to look at that during the break that we've had

10   for a week?

11   A.  I did not.

12   Q.  Okay.  So one of the accounts that's referenced in the

13   complaint, Government Exhibit 1, is a Chase IOLTA account

14   ending in 6709, and that's in paragraph 39.  This is an

15   account -- paragraph 39, page 36 -- relating to Mr. Barton, is

16   that right?

17   A.  I see that paragraph.

18   Q.  And do you see the reference to the Chase IOLTA account

19   with the ending numbers 6709?

20   A.  Yes.

21   Q.  Okay.  The complaint alleges in this paragraph that it

22   received wire transfers, correct?

23   A.  Yes.

24   Q.  And it identifies in paragraph 40 where those wire

25   transfers were coming from, Company A bank account, is that

1  right?

2  A.  Yes, one wire transfer from Company A bank account, yes.

3  Q.  And Mr. Barton was not the signatory on Company A bank

4  account, was he?

5  A.  He was not.

6  Q.  Okay.  In fact, an individual identified as CS2 was a

7  signatory on that account.

8  A.  Yes.

9  Q.  Okay.  And paragraph 40 also alleges that Bustamante

10  directed these deposits.

11  A.  Yes.

12  Q.  Okay.  And he also directed Barton, paragraph 39, to

13  transfer out of his IOLTA account certain moneys.  That's in

14  paragraph 39, correct, 39 and 40?

15  A.  I'm sorry.  Can you repeat the question?

16  Q.  Okay.  He also directed Barton --

17  A.  "He" being Bustamante?

18  Q.  Bustamante, yes, to transfer money out of that account to

19  certain locations, paragraphs 39, 40, and 41?

20  A.  I'm seeing that Bustamante directed CS2, but I'm trying to

21  locate what you're referring to as Bustamante directing Barton.

22  Q.  Whoops.

23        THE COURT:  Are you having a problem, Ms. Bogart?

24  Ms. Provine will help you.

25        MS. BOGART:  That's okay.  I don't need it right now.

1   Thank you.

2   BY MS. BOGART:

3   Q.  I think in paragraph 41, oh, yes, in (e) it says that

4   either Bustamante or Individual A instructed Barton to transfer

5   6,000 out, allowing Barton to keep 50 for a, quote, legal fee.

6   Do you see that?

7   A.  I do see that, yes.

8   Q.  Okay.  I believe that you indicate that the legal fee was

9   transferred to Barton's law firm account in the amount of $50.

10  A.  Yes.

11  Q.  Okay.  Paragraph 40, all right.  So let me show you what's

12  been marked as Barton Exhibit 2.

13          THE COURT:  You may approach.

14          MS. BOGART:  Oh, I'm sorry, Judge.

15          THE COURT:  Can you provide a copy to the Court and

16  Ms. Provine, also?

17          MS. BOGART:  Absolutely.

18          THE COURT:  Okay.  Thank you.

19  BY MS. BOGART:

20  Q.  I ask you if you recognize that, the top of that document.

21  A.  It says it's a JPMorgan Chase bank statement.

22  Q.  And does it say what is it a bank statement for?

23  A.  The firm name?

24  Q.  Yes.

25  A.  Barton Law Firm LPA, IOLTA trust account.

1  Q.  And it shows an ending account number of 6709, is that

2  correct?

3  A.  That's correct.

4  Q.  And the address on this account is where?

5  A.  7445 Airport Highway, Holland, Ohio.

6  Q.  Okay.  Does that refresh your recollection, Agent Villa, as

7  to the location of the Chase IOLTA account referenced in

8  paragraphs 39 through 41 as being in Ohio?

9  A.  That tells me the location of the law firm.

10 Q.  Right, and where the account is registered, correct?

11 A.  That's where the statements would be received if they were

12 mailed in hard copy, and that's where the owner of the account

13 is saying that's where their address is.

14 Q.  Okay.  You know the address 7445 Airport Highway --

15 A.  Yes.

16 Q.  -- Holland, Ohio, from your investigation?

17 A.  That's correct, yes.

18 Q.  And you know that to be the address of Mr. Barton's law

19 firm.

20 A.  That's where his law firm was located, yes.

21 Q.  Yes, okay.  Now, paragraph 42 on page 38 of the complaint

22 references a Chase IOLTA account number 2 ending 8870, is that

23 correct?

24 A.  Yes.

25 Q.  And in paragraph 43, it alleges that there were two wire

1  transfers or deposits into this account on or about May 17th,
2  2018, correct?
3  A.  Yes.
4  Q.  And this account was opened on or around May 16th, 2018,
5  correct?
6  A.  Yes.
7  Q.  Are you aware that that account, Chase account number 1,
8  was closed and then this account was opened?
9  A.  Yes.
10  Q.  Okay.  According to paragraph 43, there were two wire
11  transfers or deposits into this account on or about May 17th,
12  2018.  I may have already said that.  Correct?
13  A.  Yes.
14  Q.  And according to paragraph 44, the Government alleges it
15  was Bustamante's associates who deposited these funds, is that
16  right?
17  A.  Yes.
18  Q.  And this was based on conversations provided by CS2, the
19  cooperating individual, and an undercover?  Is that an
20  undercover DEA agent, UC3?
21  A.  No, that specific information, it's stating that based on
22  the totality of the investigation that's what led to that
23  conclusion.
24  Q.  Okay.  Then paragraph 44 also indicates that Bustamante
25  associates, according to Individual A, instructed Barton where

1  to wire transfer these moneys -- or to wire transfer moneys out

2  of this account, is that right?

3  A.  Yes, that Bustamante or Individual A were participants,

4  yes.

5  Q.  Okay.  On the notation, according to paragraph 43 of your

6  complaint, there was the indication that these moneys were for

7  a loan repayment, is that right?

8  A.  Yes.

9  Q.  Again, one of the transfers out in the amount of 3,000 was

10 deposited into Barton's law firm account and was labeled a

11 legal fee.

12 A.  Yes, it was Individual A legal fee, that's correct.

13 Q.  Okay.  Now, do you recall that this IOLTA account was also

14 directed to Mr. Barton's law firm at 7445 Airport Highway in

15 Holland, Ohio?

16 A.  I don't know for a fact sitting here, what the location was

17 on the statement.

18 Q.  Okay.  To your knowledge, at that time his law firm was

19 located at that address?

20 A.  In 2018?  Yes.

21 Q.  Okay.  Now, another account of Mr. Barton's that's

22 referenced in this complaint is a Huntington IOLTA account

23 ending in the numbers of 8708, and that's in paragraph 33 of

24 the complaint.

25 A.  Which paragraph?

1  Q.  33, and it's on page 31 at the bottom, last two lines, the
2  Huntington IOLTA account.
3  A.  Yes, I see that.
4  Q.  Okay.  It indicates, paragraph 33, that there were wire
5  transfers out of the account that Bustamante directed
6  Mr. Barton to make, is that right?
7  A.  Yeah, that Bustamante directed them.
8  Q.  Yes.
9  A.  Yes.
10 Q.  Okay.  Now, I think you indicated you didn't recall where
11 this account was located?
12 A.  I couldn't recall where the account was opened.
13 Q.  Okay.  Let me show you what I've marked as Barton 3.
14         THE COURT:  You may approach again.
15         MS. BOGART:  I'm sorry, Judge.  I will make a note to
16 myself to ask.
17 BY MS. BOGART:
18 Q.  Okay, Barton 3.  I'll ask you if this refreshes your
19 recollection that Huntington Bank, Huntington National Bank has
20 offices in Columbus, Ohio.
21 A.  It appears to have a P.O. box located in Columbus, Ohio.
22 Q.  Okay.  That's an address that's in the upper left-hand
23 corner, right?
24 A.  Yes.
25 Q.  And this account stated -- it appears to be an account

1  statement, correct, for the account ending in 8708?

2  A.  Yes.

3  Q.  And it's directed to the Barton Law Firm, is that right?

4  A.  Yes.

5  Q.  And again, it's directed to the 7445 Airport Highway

6  Holland, Ohio address, is that right?

7  A.  Yes.

8  Q.  This address, 7445, was also the address that Barton's

9  phone was registered to according to footnote 22 of your

10 complaint, is that right?

11 A.  What page was that?  Oh, I found it, page 41.

12 Q.  Yes.

13 A.  Yes, it's the same address.

14 Q.  Okay.  You testified, I think, on direct that you had a

15 meeting with Mr. Barton --

16 A.  Yes.

17 Q.  -- in Ohio?

18 A.  Yes.

19 Q.  Okay.  Was that meeting at the 7445 Airport Highway --

20 A.  Yes.

21 Q.  -- Holland, Ohio address?

22 A.  Yes, it was.

23 Q.  Okay.  According to your complaint, paragraph 45, this

24 Huntington Bank IOLTA account was opened in August of 2013?

25 A.  That's correct.

1    Q.  That's right?

2    A.  Yes.

3    Q.  Okay.  So this was four years prior to the beginning of the

4    events alleged in this complaint, which are August of 2017

5    according to the introduction of the complaint.

6    A.  Yes, yes.

7    Q.  All right.  So you don't have any evidence to support the

8    contention in paragraph 5(c) that this account was opened at

9    Bustamante's direction, do you?

10   A.  This specific Huntington account?

11   Q.  Right.

12   A.  No, it appears it was opened before this.

13   Q.  Okay.  Now, paragraph 47 again identifies Barton's contact

14   as initiating a wire transfer out of this Ohio account in the

15   amount of 35,000, is that right?

16   A.  Which paragraph?

17   Q.  So 47 of the complaint which is at page -- well, let's see.

18   I may have that wrong.  I'm sorry.  It's 35,000 at paragraph

19   33.  I'm sorry.  I think we already went into that.

20           THE COURT:  What is the question pending?

21           MS. BOGART:  That the wire transfer of 35,000

22   referenced in paragraph 33 was made by Barton out of the

23   account at the direction of Bustamante.

24   BY THE WITNESS:

25   A.  Yeah, it appears that was discussed between Bustamante,

1    Owen, and Barton.

2    BY MS. BOGART:

3    Q.  Yes.  And they had directed Barton to send it to a hair

4    salon in Italy, is that correct?

5    A.  Yes.

6    Q.  Okay.  That's at paragraph 33, page 32.

7    A.  Yes.

8    Q.  All right.  Then paragraph 48(a) references this Huntington

9    IOLTA account as well, does it not?  It's at pages 39 and 40.

10   Well, 48(a) is on page 40.

11   A.  Yeah, it appears to be referencing a Huntington IOLTA

12   account.

13   Q.  Right.  It's Owen and Bustamante discussing depositing

14   money into that account, correct?

15   A.  Yes.

16   Q.  Okay.  Now, this particular conversation which is

17   referenced at paragraph 48, session 490 on April 3rd, 2019, it

18   does not -- well, first of all, Barton was not a party to this

19   conversation, was he?

20   A.  No.

21   Q.  And the conversation says:

22            "Let me tell him we got another 40."

23            Then in brackets, the complaint says "40,000 in

24   narcotics proceeds."  That's your addition to the conversation,

25   correct?

1   A.  The agents, yes.

2   Q.  Yes.  Well, not you specifically, but the Government's

3   addition.  In other words, the conversation itself does not say

4   40,000 in narcotics proceeds.

5   A.  Right.  It says:

6        "Let me tell him we got another 40."

7   Q.  Right.  So it's your inference that these are narcotics

8   proceeds which is bracketed here.

9   A.  These are the Government's inferences.

10   Q.  Correct.  Okay.  Now, paragraph 50 also discusses that

11   Individual F deposited 34,400 into this Huntington IOLTA

12   account, correct?

13   A.  Yes.

14   Q.  And who is Individual F?

15       MR. McCROBIE:  Objection, Your Honor.

16       THE COURT:  Sustained.

17   BY MS. BOGART:

18   Q.  Well, do you have any indication that Individual F is

19   somebody that has --

20       MS. BOGART:  Well, strike that.

21   BY MS. BOGART:

22   Q.  Then Barton was directed to transfer money out of this

23   account by Bustamante to two -- in two different transactions,

24   one on April 8th, 2019, in the amount of 25,000 and one on

25   April 9th, 2019, in the amount of 22,000, to a bank account,

1  Company B bank account, correct?

2  A.  Yes.

3  Q.  And that is not an account that Barton had any signatory

4  authority over, is it?

5  A.  Yeah, that's right.  He didn't have signatory authority

6  over that account.

7  Q.  Okay.  Now, another account which is referenced in

8  paragraph 205 associated with Barton is the Huntington law firm

9  account ending in 8931.  That's paragraph 205, page 118 of the

10  complaint, correct?

11  A.  Yeah, I see that, yes.

12  Q.  Okay.  Do you recall where the account statements for this

13  account were being directed?

14  A.  I do not recall.

15         MS. BOGART:  Okay.  May I approach, Judge?

16         THE COURT:  You may.

17  BY MS. BOGART:

18  Q.  I'm going to hand you what I've marked as Barton 4 and ask

19  you if that document refreshes your recollection of where the

20  Huntington Bank account statements were being directed?

21  A.  Yes.  The Huntington statements were directed to 7445

22  Airport Highway, Suite 1-A, Holland, Ohio.

23  Q.  Okay.  Again, that was Barton's law firm, is that correct?

24  A.  Yes.

25  Q.  Okay.  Another account listed or referenced in this

1  complaint, a fifth account is in paragraph 67.  It's called the

2  Huntington Compliance Paymaster account, 9283, and I believe

3  it's on page -- let's see.  Is it on page 59?

4           MR. McCROBIE:  55.

5           MS. BOGART:  55, yes, 55.

6  BY MS. BOGART:

7  Q.  Do you see that reference?

8  A.  Yes.

9  Q.  And this was opened, according to paragraph 67, on or about

10  March 19th, 2019, correct?

11  A.  Yes.

12  Q.  And that was weeks before Mr. Barton retired as an attorney

13  according to your complaint on April 4th, 2019, correct?

14  A.  Yes.

15  Q.  Okay.  It states that the articles of incorporation for

16  this Paymaster account were located at 7445 Airport Highway,

17  Holland, Ohio, correct?

18  A.  Yes.

19  Q.  Okay.  Again, that's the location where Mr. Barton's law

20  firm was, correct?

21  A.  That's correct.

22  Q.  As you sit here, do you have any recollection of where the

23  statements for this Paymaster account went?

24  A.  No, I don't recall.

25           MS. BOGART:  Okay.  May I approach, Your Honor?

1          THE COURT:  You may.

2     BY MS. BOGART:

3     Q.  Let me show you what I've marked as Barton Exhibit 5 and

4     ask you if this document refreshes your recollection as to

5     where bank statements were directed at the Huntington Bank with

6     the post office box of Columbus, Ohio?

7     A.  Yes.  The address is 7445 Airport Highway, Suite 1-A,

8     Holland, Ohio.

9     Q.  Okay.  At page 55, paragraph 69, you indicate that there

10    was a $50,000 deposit from Individual H into this account,

11    correct?

12    A.  Yes.

13    Q.  And that was not Mr. Barton, was it?

14    A.  That wasn't Mr. Barton what?

15    Q.  Individual H is not Mr. Barton.

16    A.  Oh, no.

17    Q.  Okay.  Barton's actions associated with this account was to

18    transfer money out of it, correct, page 56?

19    A.  Yeah, that was one of his activities concerning the

20    account, yes.

21    Q.  Okay.  Paragraph 70, on May 3rd, 2019, Barton had wire

22    transferred the money to Company B bank account, correct?

23    A.  Yes.

24    Q.  Okay.  Barton is not affiliated with Company B bank

25    account, is he?

1  A.  No.
2  Q.  Okay.  Now, there is a reference in paragraph 69 that just
3  after the $50,000 was deposited from Individual H, Barton
4  transferred 8500 to his personal account ending in 8322,
5  correct?
6  A.  Yes.
7  Q.  And that account, do you have as you sit here today a
8  recollection as to where that account's statements were
9  located?
10 A.  No.
11         MS. BOGART:  Okay.  May I approach, Your Honor?
12         THE COURT:  You may.
13         MR. McCROBIE:  Your Honor, objection to the cumulative
14 nature and also the relevance of the location of the bank
15 accounts at issue here.
16         THE COURT:  I'll allow it.  I presume she's almost at
17 the end of this process.
18         MS. BOGART:  Yeah.
19 BY MS. BOGART:
20 Q.  I'll show you Barton 6 and ask you if that refreshes your
21 recollection as to the location of account 8322, the personal
22 account of Mr. Barton at the Huntington National Bank out of
23 Columbus, Ohio.
24 A.  Yeah, the statements would have been directed towards 7445
25 Airport Highway, Suite 1-A, Holland, Ohio.

1  Q.  Okay.  The same location that we've previously identified.

2  A.  Yes.

3  Q.  Now, aside from your visit to Ohio to see Mr. Barton, did

4  you ever see any of the -- did you or any of the agents ever

5  see Mr. Barton in any other location identified with the

6  activities in this complaint?

7  A.  Can you restate that?

8  Q.  Okay.  Let me go through this.  So paragraph 6(b) on page 5

9  identifies Mr. Bustamante traveling to Chicago.

10  A.  On which page?

11  Q.  Page 5, paragraph 6(b):

12          "On or about August 30th, 2017, Bustamante traveled to

13  Chicago."

14  A.  Yes.

15  Q.  Okay.  He's having a meeting, according to this complaint,

16  or he's traveling at the request of a Mexican-based source of

17  narcotics supply to supervise and coordinate the repayment of

18  money that a Chicago-based DTO owed the supplier.  That's what

19  that alleges, right?

20  A.  Yes.

21  Q.  Barton wasn't present in Chicago at the time that

22  Bustamante was, was he?

23  A.  I don't know Barton's location on that date.

24  Q.  Okay.  Did anybody notice that Barton -- did anybody record

25  that Barton was in Chicago at that time?

1    A.  Nobody as part of this investigation had Barton's location

2    at all, so they wouldn't have known where he was.

3    Q.  Okay.  Well, you knew he was in Ohio.

4    A.  I don't know that he was in Ohio on that date.

5    Q.  Well, you met him in Ohio, correct?

6    A.  Yes.

7    Q.  And you don't have any evidence that he was in Chicago.

8    A.  On which day?

9    Q.  August 30th, 2017.

10   A.  I don't have evidence that places him in Chicago on that

11   day, no.

12   Q.  All right.  Then paragraph 6(d) refers to a January 30th,

13   2019 meeting between Bustamante and two undercover DEA agents

14   posing as pilots.  Do you see that?

15   A.  Yes.

16   Q.  I don't know where that conversation or where that meeting

17   took place, but Barton wasn't present for that meeting, was he?

18   A.  He was not.

19   Q.  Okay.  In 6(g) on page 7, the complaint alleges that

20   Bustamante was collecting proceeds from money couriers and drug

21   traffickers in Kentucky, Ohio, Illinois, Alabama, and

22   Tennessee.  Do you see that?

23   A.  Yes.

24   Q.  Barton was not present with Bustamante on those trips, was

25   he?

1  A.  No.

2  Q.  Okay.  On page 8 where you describe Mexican cartels, you're

3  not contending that Barton had anything to do with these

4  Mexican cartels, are you?

5  A.  Are you talking about (a)?

6  Q.  7(a) through 7(h).

7        MR. McCROBIE:  Objection to the form of the question.

8  It's vague.

9  BY MS. BOGART:

10  Q.  Well, there's no allegation in 7(a) through 7(h) in which

11  you talk about in general terms money laundering and drug

12  trafficking, there's no reference to Mr. Barton in any of those

13  paragraphs, is there?

14  A.  Like you stated, it was a general explanation of money

15  laundering techniques utilized by drug-trafficking

16  organizations.

17  Q.  Right.  And Mr. Barton's name isn't mentioned in those

18  paragraphs.

19  A.  Mr. Barton's name is not mentioned in those paragraphs.

20  Q.  Okay.  Now, on page 11, paragraph 9, there's a heading in

21  the complaint that says:

22        "Bustamante coordinates Chicago based DTO's repayment

23  of money owed for 11 kilograms of heroin supplied by a Mexican

24  source of supply August 30, 2017."

25        Do you see that?

1  A.  Yes.

2  Q.  And it identifies an individual by the name of Silvano

3  Hernandez Sanchez who was indicted in case number 18 CR 524

4  with possession with intent to distribute, right?

5  A.  Yes, I see that.

6  Q.  Barton wasn't indicted in that case.

7  A.  Barton was not indicted in that case.

8  Q.  And he wasn't present at the time of the seizure, was he?

9  A.  No, he wasn't present when they seized everything.

10 Q.  Okay.  Now, on page 12 you identify a person by the name of

11 Juan Martinez Cruz.  Do you see that?

12 A.  Yes.

13 Q.  And this is a person that was indicted in the Northern

14 District of California for possession with intent to distribute

15 heroin and cocaine in case number 18 CR 460, right?

16 A.  Yes.

17 Q.  Okay.  Barton didn't have anything to do with the

18 activities in paragraph 10 or Cruz's distribution of heroin and

19 cocaine, did he?

20 A.  I don't have any information that he was involved in that.

21 Q.  On page 17, there's a recruitment of DEA agents, captioned

22 (d), section (d):

23      "Bustamante and Owen recruit undercover DEA agents to

24 fly large quantities of narcotics and narcotics proceeds,

25 January of 2019."

1          Then there's a series of paragraphs, paragraphs 14 and

2    thereafter.  Really, I think this goes through page 28, pages

3    17 through 28.  Do you see that?

4    A.  I see it, yes.

5    Q.  Barton wasn't involved in recruiting DEA agents to fly

6    large quantities of narcotics and narcotics proceeds, was he?

7    A.  He's not mentioned in that section that you referred to.

8    Q.  Okay.  Then in section (g) which begins on page 57, you

9    describe that there were proceeds of narcotics activity

10    collected from various parts of the United States.  Do you see

11    that?

12    A.  Yes.

13    Q.  And then the paragraphs -- well, let's see.  That really

14    goes from paragraph 74 to page -- to paragraph 202.  Pages 57

15    through 117 are the activities underpinning the allegation that

16    what was going on was Bustamante and Owen collecting proceeds

17    of narcotics activity, is that right?

18    A.  That's quite a bit of information to give a general comment

19    as to that.

20    Q.  Okay.  Well, let's go to the first one, which is paragraph

21    82.  Here the subheading of (2) indicates that they are

22    collecting the proceeds of narcotics activity from Louisville,

23    Kentucky.

24    A.  Yes.

25    Q.  And in addition to the activity that's described here, was

1  there some surveillance in Louisville that observed

2  Mr. Bustamante?  Look at paragraph 95.

3  A.  Yes, there's surveillance in Kentucky, yes.

4  Q.  Okay.  Mr. Barton wasn't involved in this trip to

5  Louisville, Kentucky, was he?

6  A.  I don't have any information that he was in Louisville,

7  Kentucky, at that time.

8  Q.  And he wasn't involved in any activities alleged in

9  subparagraph (b) on page 64 of Mr. Bustamante arranging travel

10  to Louisville, was he?

11  A.  No, this states here that Owen supported him in the travel.

12  Q.  Okay.  Then if we turn to subparagraph (3), page 72, it

13  indicates that there was narcotics proceeds collected in

14  Columbus, Ohio, correct?

15  A.  Yes.

16  Q.  Okay.  And that activity, Mr. Barton wasn't involved in

17  that activity, was he?  In other words, he didn't travel to

18  Ohio to collect these proceeds.

19  A.  Yeah, I don't have any information that he traveled to

20  Columbus, Ohio, with Bustamante.

21  Q.  Okay.  He wasn't present when, according to paragraph 113,

22  the proceeds from those two trips, Louisville and Ohio, were

23  deposited into Wire Transfer Business A in Chicago, page 78,

24  paragraph 113, was he?

25  A.  I don't have any information that Mr. Barton was in Chicago

1    at that time.

2    Q.  And there was surveillance on the Wire Transfer A location,

3    was there not?

4    A.  Yes, there was surveillance.

5    Q.  Okay.  And it didn't --

6    A.  That was on April 16th, the next day, yes.

7    Q.  And it didn't identify Mr. Barton.

8    A.  Yeah, Mr. Barton wasn't identified with Mr. Bustamante.

9    Q.  Okay.  Then paragraph 127 talks about collecting proceeds

10   from Boston.  Mr. Barton wasn't a part of collecting proceeds

11   of alleged narcotics activity in Boston, was he?

12   A.  I don't have any information that Mr. Barton was in Boston

13   at the time.

14   Q.  And he wasn't a part of any activity of depositing those

15   proceeds into Wire Transfer Business B in Grand Michigan,

16   Michigan, as alleged in these paragraphs.

17   A.  Yeah, I don't have any information that he was in Grand

18   Rapids at that -- during those days.

19   Q.  Again, there was surveillance, if you look at paragraph 133

20   through 137, at the Detroit Amtrak station, and Mr. Barton

21   wasn't observed there.

22   A.  That's correct.  Mr. Barton wasn't identified at that

23   location.

24   Q.  If we go to paragraph 138, caption number 7 on page 88,

25   this states that there were narcotics proceeds being collected

1   in Aurora, Illinois, and deposits into Wire Transfer Business A

2   on or about May 6th and May 7th of 2019, correct?

3   A.  Yes.

4   Q.  And Mr. Barton wasn't observed in this activity, either,

5   was he?

6   A.  He was not observed in Chicago at that time.

7   Q.  Okay.  Then if we look at pages 164 through 180 which

8   begins on 98 through 105, here it's alleged that there was

9   narcotics proceeds being collected from Individual K in

10  Birmingham, Alabama, correct?

11  A.  Yes.

12  Q.  And Mr. Barton wasn't observed in either collecting those

13  proceeds or in the surveillance at the Alabama airport or the

14  Walmart Auto Center?

15  A.  Mr. Barton was not observed in those locations, no.

16  Q.  Then if we go to page 105 --

17          THE COURT:  I presume this is relating to a venue

18  argument you're going to be making?

19          MS. BOGART:  It is that.

20          THE COURT:  So is the Government going to be offering

21  anywhere in this current complaint that Mr. Barton's physical

22  location is anywhere other than Ohio?

23          MR. McCROBIE:  Physically, no.

24          THE COURT:  All right.  So that should do it.

25          MS. BOGART:  So that takes me through the last items.

1  I was almost done with it.  Thank you, Judge.

2  BY MS. BOGART:

3  Q.  So in paragraph 7(g) of this complaint which is on page 10,

4  you discuss what is called layering.  Do you see that?

5  A.  Yes.

6  Q.  Okay.  As I understand your discussion here about how drug

7  dealers handle the proceeds of their drug activity, there is,

8  first of all, the organizations that gather up the materials

9  and make the drugs.  Then they distribute that, the second

10  layer, to people to sell the drugs.  Then they have

11  individuals, third layer, going out to collect the proceeds of

12  those drug sales.  These are what you've alleged in these

13  various paragraphs in Alabama, Ohio, Boston, et cetera,

14  correct?

15  A.  The section that describes the laundering of drug proceeds

16  doesn't cover the distribution of narcotics.

17  Q.  No.  But I'm just saying the layers that are involved.  I

18  mean, you start with the cartels in paragraph 7(a).

19  A.  Yes.

20  Q.  Okay.  So we have, you know, the making of the drugs.  We

21  have the provision to the distributors of the drugs or the

22  salespersons of the drugs.  Then we have the activity of

23  collecting proceeds from the drugs which is what's alleged in

24  Alabama, Ohio, Boston, et cetera, right?

25  A.  Yes, that's correct.

1  Q.  And then those proceeds, according to this complaint and

2  the activities in this complaint, were deposited into a fourth

3  layer, which is Wire Transfer A, Wire Transfer B, various

4  accounts, correct?

5  A.  I'm not certain on the number of layers that you're stating

6  there.

7  Q.  Well --

8          THE COURT:  Do you agree in general with the layers

9  that she's describing, just giving a descriptor to the various

10 layers?

11 BY THE WITNESS:

12 A.  Can you describe that again?  I'm sorry.

13 BY MS. BOGART:

14 Q.  Okay.  Well, it's in your paragraph 7.  So there's the

15 groups or individuals that make the drugs.  That's probably one

16 or more --

17         THE COURT:  Ms. Bogart, are you talking about just in

18 general a drug conspiracy layer or the layer of a financial

19 layer or the layer of the workers within the conspiracy?

20         MS. BOGART:  Well, I'm talking about and really meant

21 to get to the layers within the financial transactions.

22         THE COURT:  Well, you can focus on that, I think --

23         MS. BOGART:  Yeah, okay.

24         THE COURT:  -- because you were focusing him on (g)

25 which is a financial layer.

1          MS. BOGART:  Exactly.

2          THE COURT:  All right.

3    BY MS. BOGART:

4    Q.  So as I understand it, there's various steps in this

5    process, including collecting the proceeds of alleged narcotics

6    activity which is described in this complaint, right?

7    A.  Yes.

8    Q.  And that was proceeds in Ohio and Alabama and Boston and

9    these various cities that you identified, correct?

10   A.  Yes.

11   Q.  Okay.  Then those moneys, according to your complaint, were

12   deposited into Wire Transfer Business A, and that appears at

13   paragraph 41 and paragraph 117?

14   A.  Yeah.  That's one of the instances that we described as

15   part of the wire transfer business.

16   Q.  Right.  Then there was also -- and that was in Chicago,

17   right?

18   A.  Yes.

19   Q.  Or nearby.

20   A.  One of them was Chicago, and then Grand Rapids.

21   Q.  Wire Transfer B was Grand Rapids.

22   A.  Yes.

23   Q.  That was another location.

24   A.  Yes.

25   Q.  And then there was some deposited into Company A bank

1   account.  That's paragraph 6(c) of this complaint --

2   A.  Yes.

3   Q.  -- and 6(d).  Then some of them were deposited into Company

4   B bank account which appears at paragraphs 50, 71, and 126?

5   A.  Can you repeat that second one?

6   Q.  Company B bank account?

7   A.  Yes.

8   Q.  Paragraphs 50, 71, and 126, I believe.  Well, not 50, let

9   me look at 71.

10  A.  Yeah, paragraph 50 states the Huntington IOLTA account --

11  Q.  Right.

12  A.  -- cash deposits.

13  Q.  Let me just look.  Well, let's look at paragraph 121, which

14  is a UC bank account, correct?

15  A.  Yes.

16  Q.  Yes, okay.  Then from these bank accounts, the moneys are

17  transferred out to other bank accounts, correct?

18  A.  Yes, that's the layering.

19  Q.  Okay.  One of the accounts that these moneys were

20  transferred to was Barton's account.

21  A.  For this particular example, the narcotics proceeds are

22  deposited into a UC account and then they're transferred to

23  another account, not Mr. Barton's.

24  Q.  Not Mr. Barton's, but that's after they're deposited in

25  these accounts.  So some of the proceeds were transferred from

1  Company A bank account, paragraph 41, and Company C bank

2  account, paragraph 58.

3  A.  Now we're in a new paragraph?

4  Q.  Yeah, paragraph 41.  We talked about the proceeds going

5  into Company A bank account and then being transferred out

6  to -- well, actually it's the UC bank account and then being

7  transferred out to a Barton account, correct?

8  A.  No, the 94,000 that was deposited in the UC bank account

9  was transferred to another account.

10  Q.  Oh, and then it was transferred to Barton, the 94,000.

11  A.  No.  The overlap is narcotics proceeds were deposited to

12  the UC bank account and the UC was instructed to transfer that

13  to another company.  That was the same company that Mr. Barton,

14  after receiving a cash deposit, had transferred it to the same

15  company.  That's the connection.

16  Q.  Okay.

17  A.  So that's part of the layering that is described in the

18  earlier paragraphs.

19  Q.  All right.  So he's really kind of the final place of where

20  moneys go, and then he's instructed to send --

21  A.  That's not the final place, no.

22  Q.  Well, then he's --

23  A.  He's one of the steps.  He's one of the steps in the

24  layering process.

25  Q.  At the bottom, and then he's --

1  A.  Yes, at some point of the layering.

2  Q.  Yes, and then he was instructed to send some to the Italian

3  hair salon and some to another location and to another

4  location, correct?

5  A.  Yes.

6  Q.  None of which locations had he any connection with

7  according to your complaint.

8  A.  Some he had asked -- the day after he had initiated the

9  transfer, he had asked Bustamante what the company is.

10  Q.  Here's the question.  He didn't have any connection to

11  those bank accounts that he was transferring the money into.

12  A.  What type of connection?

13  Q.  Well, he wasn't a signatory at the bank.

14  A.  No, he was not.

15  Q.  The Company A bank account or the Company B bank account.

16  He didn't have any involvement to your knowledge in the Italian

17  hair salon.

18  A.  It didn't appear that he had any legitimate business

19  transaction -- any legitimate business with them.

20  Q.  Well, here's the question.

21          MS. BOGART:  I'm going to strike that answer.  It's

22  not responsive.

23          THE COURT:  I will let it stand.

24          MS. BOGART:  Okay.

25          THE COURT:  You can try to strike it, but you can't

1   just say:  I'm going to strike it.

2          MS. BOGART:  Well, I'd strike the answer as not

3   responsive, Judge.

4          THE COURT:  And that is not -- I will overrule that.

5          MS. BOGART:  Okay.

6          THE COURT:  And it will stand.

7          MS. BOGART:  All right.

8   BY MS. BOGART:

9   Q.  He transferred moneys to those locations at the direction

10  of Mr. Bustamante.

11  A.  Yes.

12  Q.  Okay.  Now, in reading your complaint, it doesn't appear

13  that you have any direct -- you have no allegation directly

14  that Mr. Barton was told specifically that the moneys he was

15  transferring to the Company B account or the Italian hair salon

16  were the proceeds of laundered narcotics activity, correct?

17  A.  Like you'd mentioned before, the inference for narcotics

18  proceeds was the totality of the investigation.

19  Q.  Yeah, it's your inference.  But there's no conversation

20  that you have identified in which Mr. Bustamante or Mr. Owen or

21  anybody else said to Mr. Barton:  By the way, these moneys are

22  the proceeds of the sale of unlawful narcotics.

23  A.  I'm unaware that those specific words were used.

24  Q.  Okay.  So one of the words that you testified to that you,

25  I think, want us to draw an inference from that Mr. Barton

1   should have known was use of the term "hemp," correct?

2   A.  That term was used, yes.

3   Q.  Okay.  Is it your contention that the use of the term

4   "hemp" should have alerted Mr. Barton that there was unlawful

5   narcotics proceeds that were being deposited into his account

6   or that he was transferring out of his account?

7   A.  It's a term that can be used.

8   Q.  Well, I'm asking you.  Do you want the Court to infer in

9   this case that the use of the term "hemp" was a reference to

10  unlawful narcotics proceeds?

11  A.  It would be the use of the term, but also the totality of

12  the investigation, other conversations that were had, other

13  surveillance, you know, other items that are identified.

14  Q.  Okay.  Aside from the reference of "hemp" in page 33,

15  paragraph 32, is there any other time that the term "hemp" was

16  mentioned to Mr. Barton by Bustamante or Owen?

17  A.  I'd have to search all the line sheets to get an answer to

18  that.

19  Q.  Nothing in this complaint.

20  A.  No, I believe that's the only statement in the complaint.

21  Q.  Okay.  That conversation in which the term "hemp" appears

22  was May 11th, 2019, correct?

23  A.  Yes.

24  Q.  Okay.  As of May 11th, 2019, hemp was legal in the United

25  States, correct?

1       MR. McCROBIE:  Objection, relevance.

2       THE COURT:  I'll let him respond.

3   BY THE WITNESS:

4   A.  As in marijuana?

5   BY MS. BOGART:

6   Q.  Hemp.  Hemp was legalized in the Agricultural Improvement

7   Act of 2018, correct?

8   A.  I don't know that now.

9       MS. BOGART:  Okay.  Well, I'd ask the Court to take

10  judicial notice of the Agricultural Improvement Act --

11      THE COURT:  I presume you'll put that in your argument

12  to the Court.

13      MS. BOGART:  I will, yeah.

14      THE COURT:  Okay.

15      MS. BOGART:  -- in which the product of hemp was

16  legalized.

17  BY MS. BOGART:

18  Q.  Another term that you used or that you identified in your

19  testimony was the term "textiles," correct?

20  A.  Yes.

21  Q.  And that was also used in paragraph 33, correct?

22  A.  Yes.

23  Q.  A reference in that paragraph to Mr. Barton?

24  A.  Yes, it was.

25  Q.  And you testified on your direct examination that you

1  attributed or that you construed the term "textiles" to be code

2  for narcotics, correct?

3  A.  That term was identified in the undercover meeting as a

4  term used for narcotics, yes.

5  Q.  And that was the undercover meeting between Mr. Bustamante

6  and the two undercover DEA agents he was recruiting as pilots.

7  A.  Yes.

8  Q.  But no conversation with Mr. Barton.

9  A.  I don't know about any conversation.  I'd have to search

10  the line sheets.

11  Q.  Well, except in here, but Mr. Barton wasn't present for --

12          THE COURT:  In the complaint.

13  BY MS. BOGART:

14  Q.  In the complaint.

15  A.  Okay.

16  Q.  It appears in paragraph 33, but Mr. Barton wasn't present

17  for that conversation where Mr. Bustamante used the term

18  "textiles" to be code for narcotics.

19  A.  Mr. Barton was not present during the undercover meeting.

20  Q.  Okay.  And are you familiar with the definition of

21  "textiles"?  I mean, the innocent definition?

22  A.  Yeah, loosely, yes.

23  Q.  To one who may not have been involved in lots of narcotics

24  investigations, et cetera, I mean, textiles is a -- you know,

25  basically are fabric and cloth.  It has a legitimate

1  definition, correct?

2  A.  It does have a legitimate definition, yes.

3  Q.  Okay.  Another reference here is to "farm equipment" or

4  "construction equipment."  I'm sorry.  It's "construction

5  equipment."  Certainly, the term -- and that's again in

6  paragraph 33 on page 32.  The term "construction equipment" can

7  certainly have an innocent construction, correct?

8  A.  It can have an innocent meaning, yes.

9  Q.  To you, it was something that referenced narcotics

10  activity, right?

11  A.  I'm not quite sure "construction equipment" itself, but

12  that was more part of the fabricating of the cover story for

13  the origin of the funds.

14  Q.  Okay.  So that is something that I wanted to go into.  In

15  paragraph 48(b), the complaint discusses a conversation on

16  April 3rd, 2019, between Mr. Bustamante and Owen, and in it

17  they're talking about a story that they could give Barton about

18  the origin of the money that they're going to be depositing

19  into his account, correct?

20  A.  Yes.

21  Q.  Okay.  They say:

22          "We can't tell him it's cannabis, you know.  You can't

23  say cannabis."

24          Then your brackets say:

25          "They must conceal the true source of the cash

1    deposits."

2        Is that correct?

3    A.  Yes.

4    Q.  Okay.  Then Bustamante says:

5        "I don't know.  Make something up and I'll follow

6    along."

7        Owen suggests "farm equipment," and Bustamante replies

8    "sure."  Okay?

9    A.  Yes, I see that, yeah.

10   Q.  Okay.  So this was because Barton had been asking questions

11   when moneys were being deposited into his account about what

12   the source of the moneys were and about the businesses to whom

13   they were going to be directed, correct?

14   A.  Sometimes he would ask before and sometimes he would ask

15   after the activity took place.

16   Q.  Okay.  But he was asking and trying to determine that,

17   those pieces of information.

18   A.  It appears so, yes.

19   Q.  Okay.  Now going back to this paragraph 33 that we have

20   identified previously in which there's a discussion of the

21   proceeds of the sale of marijuana from -- well, let me see.

22   Was it 33?  Oh, no, 36.

23   A.  Uh-huh.

24   Q.  Proceeds of the sale of marijuana from -- it's on page

25   34 -- from states where selling marijuana was legal, Washington

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 38 of 66 PageID #:410
Villa - cross by Bogart
100

1  state and I think maybe California.  Do you recall --

2  A.  Yes, I see that.

3  Q.  -- you went into that?  Okay.  In this meeting, Barton

4  says -- and it appears on page 34 at 1, 2, 3, 4, 5, 6:

5       "I can lay out the compliance issues for you and we

6  can see if there is a chance for success or not."

7       Correct?

8  A.  Yes.

9  Q.  And what he means is what the compliance issues are for

10  people who grow and sell -- well, sell marijuana legally and

11  what needs, you know, what they might have to represent in

12  order to do that.

13  A.  I don't know that that means that.

14  Q.  You don't know?

15  A.  No, because in the next paragraph (c) they state about

16  moving money to Mexico.

17  Q.  Well, that some of these people are moving.

18  A.  Yes, he references Lalo:

19       "Lalo or another friend of his, they just need

20  deposits and sent to Mexico."

21  Q.  Yeah.

22  A.  So that would indicate that it was outside these legal

23  states and that that product was coming from Mexico.

24  Q.  Well, I don't know that it indicates --

25       MS. BOGART:  Well, I'm going to strike that answer.

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 39 of 66 PageID #:411
Villa - cross by Bogart
101

1        THE COURT:  Again, you're not going to strike an

2   answer.

3        MS. BOGART:  Well, I'd ask to strike the answer as not

4   responsive.

5        THE COURT:  It is responsive to your question, so it

6   will stand.

7        MS. BOGART:  Okay.

8        THE COURT:  He had a disagreement with your

9   characterization.

10       MS. BOGART:  Yeah.

11  BY MS. BOGART:

12  Q.  Well, I'm only looking at paragraph (a) for the moment.  I

13  haven't gotten to paragraph (b), but what --

14  A.  Yeah, we were just covering (b).

15  Q.  Yes, (b), exactly.

16  A.  And that's in (c).  That's right there.

17  Q.  Yeah, you went ahead to (c), and I'm talking about (b).

18  The point is Barton says he can lay out the compliance issues,

19  correct?

20  A.  Yes, I see that, yes.

21  Q.  Okay.  And he identifies the issues that, you know, will

22  come up in a compliance situation:

23       "You know what those issues are, origin of funds,

24  money laundering, terrorists, no bribes involved, no foreign

25  assets.  By now, it's a pretty long list."

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 40 of 66 PageID #:412
Villa - cross by Bogart
102

1    A.  Yeah, I see it, yes.

2    Q.  Okay.  So he doesn't say:  Well, just deposit them into my

3    account, and I'll transfer the funds out for you.

4         Does he?

5    A.  He does not say those words in this complaint.

6    Q.  Okay.  So he's not agreeing to take the proceeds of even

7    lawful sales of marijuana into his account.

8    A.  No, I don't know that because this conversation takes place

9    after another conversation where Individual F had money seized

10   from him.

11   Q.  Yeah.

12   A.  Mr. Bustamante and Mr. Barton had that discussion about the

13   money being discussed from Individual F, yet he's continuing to

14   move forward August 9th.

15   Q.  Well, who was Individual F?  Who is Individual F?

16   A.  Individual F is the same --

17              MR. McCROBIE:  Objection.

18              THE COURT:  The objection is sustained.

19              THE WITNESS:  Sorry.

20              MS. BOGART:  Okay.

21   BY MS. BOGART:

22   Q.  Well, my point is he's giving the compliance issues here,

23   but he's not saying:  Deposit them into my account.

24              He's not saying:  I'll take the sale -- I'll take the

25   proceeds from the lawful sale of marijuana and have them

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 41 of 66 PageID #:413
Villa - cross by Bogart
103

1   deposited into my account.

2   A.  He does not state those words.

3   Q.  Okay.

4   A.  No, he does not.

5   Q.  Now, were you involved in the arrest of Mr. Barton?

6   A.  Yes, I was.

7   Q.  Okay.  You didn't find any drugs on him at the time of his

8   arrest, did you?

9           MR. McCROBIE:  Objection.

10          THE COURT:  I'll allow it.  Now I am curious.

11  BY THE WITNESS:

12  A.  No.

13  BY MS. BOGART:

14  Q.  Or large amounts of cash?

15  A.  I don't recall any large amounts of cash, no.

16  Q.  And you didn't conduct any search warrants at his office or

17  home?

18  A.  We did not, no.

19  Q.  Okay.  And you seized his cell phone, correct, and some

20  thumb drives?

21  A.  Agents as part of that arrest, yes, seized them.

22  Q.  Okay.  And no search warrants were issued for those items.

23          MR. McCROBIE:  Objection.

24          THE COURT:  Again, he can respond if he knows.

25  BY THE WITNESS:

1  A.  I don't know if any search warrants have been issued for

2  those.

3  BY MS. BOGART:

4  Q.  And you're not aware of any.

5  A.  I have not sworn out any search warrants for them.

6  Q.  Okay.  And you're not aware of them having been sworn out

7  as part of your investigation.

8  A.  Like I said, I don't know.

9         MS. BOGART:  Okay.  Judge, that's all of my questions.

10        THE COURT:  Mr. Saltzman, you're up to bat.

11        MR. SALTZMAN:  Thank you, Judge.  Judge, may I have a

12  brief moment?  I think I can -- this will take two seconds.

13        THE COURT:  Two seconds, sure.

14     (Recess.)

15        MR. SALTZMAN:  Judge, I believe the assistant U.S.

16  Attorney and I are prepared to stipulate that Mr. Owen was not

17  physically present in the Northern District of Illinois,

18  including Chicago, involving any of the incidents alleged in

19  the complaint.

20        THE COURT:  So stipulated?

21        MR. McCROBIE:  Yes.

22        THE COURT:  All right.

23                    CROSS-EXAMINATION

24  BY MR. SALTZMAN:

25  Q.  Good afternoon, Agent Villa.

1    A.  Good afternoon.

2    Q.  Directing your attention to paragraph 5(b) on page 4 of the

3    complaint, which narcotics traffickers does the DEA believe

4    Mr. Owen assisted Mr. Bustamante in finding?

5    A.  I'd have to review our file and confer with DEA agents on

6    that.

7    Q.  As you sit here now, you have no knowledge that he helped,

8    that Mr. Owen helped Mr. Bustamante find narcotics traffickers,

9    is that correct?

10   A.  I don't know that sitting here right now, no.

11   Q.  The same thing on which other elicit other proceeds owners

12   does the DEA believe Mr. Owen assisted Mr. Bustamante in

13   finding?

14   A.  Again, I would have to look at the case file, the line

15   sheets and other evidence that we have.

16   Q.  So as you sit here, you have no knowledge that Mr. Owen

17   assisted Mr. Bustamante in getting other elicit --

18   A.  I wouldn't be able to list or name the owners of the

19   proceeds.

20   Q.  Okay.  Now directing your attention to paragraphs 9 through

21   11 at pages -- and this is under subheading (b) -- 9 through 11

22   on pages 11 through 13, does the DEA believe that any of the

23   defendants in this case had anything to do with the seizure of

24   approximately 11 kilograms of heroin from Silvano Hernandez

25   Sanchez?

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 44 of 66 PageID #:416
Villa - cross by Saltzman
106

1  A.  I don't have any evidence indicating that the three were

2  involved in that.

3  Q.  Who do you believe sent Bustamante to meet with the

4  Chicago-based Martinez DTO and supervise repayment for the

5  Mexican source of supply for the seized heroin?

6           THE COURT:  I think I'm not following.  Where are you?

7           MR. SALTZMAN:  It says it's paragraph 10, Judge.

8           THE COURT:  All right.  Thank you.

9           MR. SALTZMAN:  I'm sorry.  Paragraph 10 on the bottom

10  of page 11 and the top of page 12.

11           THE COURT:  And could you restate your question?  I

12  interrupted you.

13           MR. SALTZMAN:  Yes, Judge.

14  BY MR. SALTZMAN:

15  Q.  Who sent Mr. Bustamante to meet with the Chicago-based

16  Martinez DTO and supervise repayment of the Mexican source of

17  supply for the seized heroin?

18  A.  It states that Bustamante was sent by the Mexican source of

19  supply.

20  Q.  And who was the Mexican source of supply?

21  A.  CS1 advised that that's the information CS1 had been given.

22  Q.  You don't know who the -- as you're sitting here today, you

23  don't know who the Mexican source of supply was?

24  A.  Sitting here today, I couldn't state who that was.

25           THE COURT:  But the information came from CS1.  Is

1    that what you're telling the Court?

2            THE WITNESS:  Yes.  CS1 advised the agents that on or

3    about August 3, 2017, an unknown individual later identified as

4    Erick Bustamante was sent by the Mexico source of supply to

5    meet with members of the Chicago-based drug-trafficking

6    organization.

7    BY MR. SALTZMAN:

8    Q.  Directing your attention to footnote 2 on pages 5 through

9    6, it says that CS2 began cooperating with the DEA in January

10   of 2019, correct?

11   A.  Yes.

12   Q.  How did that happen?  In other words, did he come to the

13   DEA or did the DEA go to him?

14   A.  Yeah, an agent had approached CS2.

15   Q.  Okay.  Footnote 2 also references that in March of 2019 the

16   agents believed that CS2 had told them untruths, correct?

17   A.  I don't know if it was plural, but there was one untruth.

18   Q.  Untruth.

19   A.  One untruth described there, yes.

20   Q.  Does the DEA believe that this was the only time that CS2

21   gave incorrect or untruthful information to the DEA?

22   A.  I'm unaware of any untruthful information, and there's none

23   listed here in the complaint.

24   Q.  Okay.  Directing your attention to paragraph 13(b) on page

25   14, on what basis does --

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 46 of 66 PageID #:418
Villa - cross by Saltzman
108

 1  A.  I'm sorry.  Which page?

 2  Q.  Page 14, paragraph 13(b).  On what basis does the DEA

 3  believe that Mr. Owen introduced CS2 to Mr. Bustamante?

 4  A.  That was according to CS2 on the bottom of page 13.

 5  Q.  Okay.  I'm sorry.  What did CS2 say in terms of how that

 6  all happened, in other words, the introduction of

 7  Mr. Bustamante by Mr. Owen to CS2?

 8  A.  Without going through the underlying memorandum, just

 9  what's stated here in the complaint.

10  Q.  Oh, okay.  Now, in this complaint it's alleged that the

11  money laundering scheme involving CS2 existed from August of

12  2017 until sometime in 2019, correct?

13  A.  That's what the complaint alleges, yes.

14  Q.  So for the period of -- so for about a year and a half, so

15  that's early 2016 to August of 2017, there was no money

16  laundering by Mr. Bustamante with CS2, is that correct?

17  A.  I don't know if there was no money laundering at all, but

18  our investigation covers August of 2017.

19  Q.  Were CS2 and Mr. Bustamante conducting business during that

20  time?

21  A.  During which time?

22  Q.  When CS2 claims he was first introduced to Mr. Bustamante

23  in early 2016.  From that period to before August of 2017, were

24  CS2 and Mr. Bustamante engaged in business?

25  A.  According to the complaint, they were discussing issues

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 47 of 66 PageID #:419
Villa - cross by Saltzman
109

1   with the oil refinery industry.

2   Q.  Do you know if there was any money involved in that, or

3   were there just discussions?

4   A.  To my understanding, there were just discussions.

5   Q.  What role, if any, did Mr. Owen play in those discussions?

6   A.  Again, I would have to check the underlying memorandum of

7   interviews to distinguish what Bustamante and Owen had stated

8   with CS2.

9   Q.  Can you state or do you know know how Mr. Owen knew CS2?

10  A.  I don't know that outside of what's listed here in the

11  complaint.

12  Q.  Now, in paragraph (d) on page -- subparagraph (d) on page

13  14, it states:

14          "In January 2018, CS2 began to suspect that the money

15  that Bustamante was moving through Company A bank account 1 was

16  proceeds from the sale of narcotics."

17          Correct?

18  A.  Yes.

19  Q.  And is the basis of that what's stated in the next sentence

20  that goes onto page 15?

21  A.  Yeah, there was a couple of issues.  One was not receiving

22  the invoice related to the deposit and then also being

23  contacted by an individual named Lalo that accused CS2 of

24  stealing money and threatened to physically harm CS2.

25  Q.  Well, with respect to not receiving the invoice, CS2 still

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 48 of 66 PageID #:420
Villa - cross by Saltzman
110

1    went ahead with the money transaction, is that correct?

2    A.  Yes.

3    Q.  And when this individual Lalo called CS2, who did he say he

4    was?

5    A.  From the complaint, he's identified as Lalo, no other

6    information.

7    Q.  I see that's what the complaint says.  I'm asking you if

8    you have any further information as to who --

9    A.  I'd have to check the underlying memos to have any

10   additional information.

11          THE COURT:  He's asking if you have any further

12   information.

13          THE WITNESS:  About how that conversation took place

14   and how Lalo identified himself?

15          MR. SALTZMAN:  Yes.

16          THE COURT:  How Lalo identified himself.

17          THE WITNESS:  I don't know.

18   BY MR. SALTZMAN:

19   Q.  Okay.  Now, Mr. Owen, again according to these paragraphs,

20   Mr. Owen -- in introducing Mr. Bustamante to CS2, Mr. Owen made

21   reference to being involved in the oil refinery industry, is

22   that correct?

23   A.  Do you have a reference for that, for Owen's participation?

24   Q.  Yes, paragraph 13(b) on page 14.

25   A.  I don't see any indication in that paragraph that Owen

1    claimed to be in the oil refinery business.

2    Q.  Okay.  It was Mr. Bustamante who claimed that, is that

3    correct?

4    A.  Yes, that he had investors that were interested in that

5    type of investments or industry.

6    Q.  So did -- I'll try to do this real quick because I think

7    you've answered it.  You don't -- as you're sitting here today,

8    you don't have any knowledge when Lalo first talked to CS2 that

9    CS2 had any understanding of who he was, is that correct?

10   A.  Not that he didn't have any understanding of who he was but

11   which way he described himself or how he described himself

12   other than Lalo.

13   Q.  Did CS2 or Lalo conduct any business together beginning in

14   January of 2018?

15   A.  It doesn't appear CS2 was aware of Lalo's participation in

16   any of this activity in January of 2018.

17   Q.  Now, CS2 didn't begin to cooperate until January of 2019,

18   right?

19   A.  Yes.

20   Q.  So it's fair to say that for a period of about a year he

21   had beliefs that he was involved in money laundering of illegal

22   narcotics proceeds, correct?

23   A.  Yes.

24   Q.  Directing your attention to paragraph 12 at page 13, it

25   alleges that Company A bank account's cash deposits began

1  increasing dramatically in August of 2017, correct?

2  A.  Yes.  Excuse me.  It began in August of 2017 and increased

3  in November of 2017.

4  Q.  Excuse me.

5  A.  Sorry.

6  Q.  I'm sorry, too.  Why does the DEA believe that happened?

7  In other words, what was causing the increase?

8  A.  That would be speculation.  Right now, I couldn't tell you

9  what their drug-trafficking or money-laundering organization

10  was thinking at the time.

11  Q.  Okay.  Is there -- on what basis does the DEA believe that

12  Mr. Owen knew that these transfers were funds derived from

13  illegal narcotics transactions?

14  A.  I would have to flip through the complaint and read from

15  the complaint of Owen's knowledge.

16  Q.  Okay.  I'm not going to ask you to do that.  I'm going on.

17  Directing your attention to page 17, subheading (d), it says:

18       "Bustamante and Owen recruit undercover DEA agents to

19  fly large quantities of narcotics and narcotics proceeds."

20       Do you see that?

21  A.  Yes.

22  Q.  And that begins on -- what's the basis for saying that

23  Mr. Owen recruited undercover DEA agents?

24  A.  It would be the discussions between Mr. Bustamante and

25  Mr. Owen.

Villa - cross by Saltzman

113

1  Q.  Are you referring to paragraph 22(a)?

2  A.  That would be one of the discussions, it appears, yes.

3  Q.  Well, what causes -- what would cause the DEA to believe

4  that this discussion indicated that Mr. Owen was recruiting

5  undercover DEA agents?

6  A.  Owen's discussion of the domestic flight matches the

7  conversations that the UC and Mr. Bustamante had.

8  Q.  Okay.  Directing your attention to page 28, paragraph 26,

9  this goes through page 35, paragraph 37.  Let me ask you the

10  question.  On what factual basis does the DEA conclude that

11  Mr. Owen knew that Lalo was a Mexican-based associate of

12  narcotics traffickers?  You might want to look specifically at

13  pages 31 through 32, paragraph 33, and page 33, paragraph 35.

14        THE COURT:  I'm going to take a five-minute break at

15  this point while he's reviewing that, and I would suggest you

16  take a little break, too, if you need to use the facilities.

17        MR. SALTZMAN:  Thank you very much, Judge.

18        THE COURT:  All right.

19     (Recess.)

20        THE COURT:  We have been on the bench since this

21  morning, so we tried our best to do it in five minutes.

22        MR. SALTZMAN:  I always support taking care of honest

23  human needs, Judge.

24        THE COURT:  Very well.  All right.  Well, you may

25  proceed.

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 52 of 66 PageID #:424
Villa - cross by Saltzman
114

```
 1              MR. SALTZMAN:  Thank you.
 2   BY MR. SALTZMAN:
 3   Q.  Okay.  I'd direct your attention to the portion of
 4   paragraph 33 that's on the top of page 32.  Does the DEA
 5   contend that what was being said by Mr. Bustamante and Mr. Owen
 6   in that paragraph was not true?
 7   A.  Yes, given the context of the April 3rd, 2019 conversation
 8   between Mr. Bustamante and Mr. Owen on page 39, paragraph 48.
 9   The conversation you're referring to is May 11th.  On April
10   3rd, they discussed not disclosing the fact that the money was
11   narcotics proceeds, that it was derived from the sale of
12   cannabis.
13   Q.  I'm sorry.  What were you referencing?
14   A.  Paragraph 48, subparagraph (b), and he also references --
15   Mr. Owen references Lalo in that paragraph, also.
16   Q.  Okay.  Excuse me.  I want to direct your attention to page
17   35, subheading (f), where it says:
18              "Bustamante owned and Barton controlled bank accounts
19   to launder narcotic proceeds for Lalo, Individual A, and other
20   narcotic traffickers."
21              Do you see that?
22   A.  Yes.
23              MS. BOGART:  I'm sorry.  Which paragraph?
24              MR. SALTZMAN:  Subheading (f) on page 35.
25              MS. BOGART:  Thank you.
```

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 53 of 66 PageID #:425
Villa - cross by Saltzman
115

1  BY MR. SALTZMAN:

2  Q.  What's the basis for the DEA to believe that Mr. Owen was

3  using Barton-controlled bank accounts to launder narcotics

4  proceeds for the individuals that are listed there?

5  A.  Again, it would be numerous phone conversations, including

6  the one where Mr. Owen and Mr. Bustamante discuss concealing

7  the source of the funds.

8  Q.  Then directing your attention to page 58, subheading (1):

9         "Bustamante and Owen recruited undercover DEA agent

10  posing as Chicago area businessman to provide a bank account to

11  launder money."

12        Do you see that?

13  A.  Yes.

14  Q.  What did Mr. Owen do to recruit this undercover DEA agent?

15  A.  There's a few conversations between Mr. Owen and CS2 and

16  Mr. Owen and Mr. Bustamante discussing this.

17  Q.  Listed in the complaint.

18  A.  Yes.

19  Q.  Okay.  That would be from page 58 to page 62, paragraphs 8,

20  right?  It's the allegations contained in those pages, right?

21  A.  Yes.

22  Q.  Okay.  Again, what's the factual basis that caused the DEA

23  to conclude that Mr. Owen knew that UC3 was providing a bank

24  account for the purpose of laundering narcotics proceeds?

25  A.  We knew that there was no legitimate business purpose

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 54 of 66 PageID #:426
Villa - cross by Saltzman
116

1  because he was dealing with someone who was a UC.

2  Q.  But Mr. Owen didn't know that.  Are you saying that they

3  knew he was an undercover agent?  Of course, they didn't know

4  that, right?

5  A.  No, that there was no legitimate business purpose.

6  Q.  Oh, okay.

7  A.  There was no legitimate business purpose with this

8  undercover.  There was no preexisting relationship.

9  Q.  And how did Mr. Owen know that?

10  A.  I would have to go through the line sheets and the

11  information here in the complaint.

12  Q.  Okay.  Now directing your attention to page 63, subheading

13  (2), well, yeah, subheading (2):

14         "Bustamante and Owen launder $114,000 of narcotics

15  proceeds from a narcotics trafficker near Louisville,

16  Kentucky."

17         Do you see that?

18  A.  Yes.

19  Q.  Mr. Owen wasn't in Louisville, was he?

20  A.  He was not observed in Louisville, no.

21  Q.  All he did was have some phone conversations with

22  Mr. Bustamante, correct?

23  A.  He did have some phone conversations with Mr. Bustamante.

24  Q.  And he helped him arrange travel, correct?

25  A.  He did do that, yes.

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 55 of 66 PageID #:427
Villa - cross by Saltzman
117

1    Q.  How did he know -- what does the DEA believe shows that

2    Mr. Owen knew that in arranging travel for Mr. Bustamante that

3    Mr. Bustamante would be collecting illegal narcotics proceeds?

4    A.  There's a phone conversation on page 66, and Mr. Bustamante

5    states that Lalo usually has someone that would arrange travel

6    for him and that he wasn't available so that, you know, he

7    needed assistance.  So it links to Lalo.

8            MS. BOGART:  I'm sorry.  Can you tell me, is there a

9    paragraph or something for this?

10           THE WITNESS:  I'm sorry.  It was page 66, number

11   87(a).

12           MS. BOGART:  Okay.

13   BY MR. SALTZMAN:

14   Q.  Directing --

15           MS. BOGART:  I see.  Okay.

16   BY MR. SALTZMAN:

17   Q.  Directing your attention to page 72, subheading (3), what's

18   the factual that causes the DEA to conclude that Mr. Owen knew

19   that Mr. Bustamante was laundering approximately $100,000 that

20   Bustamante collected in Columbus, Ohio?

21   A.  Well, there's a conversation on the 15th where

22   Mr. Bustamante describes having a gun pulled on him and being

23   accused of being a DEA agent.

24   Q.  And that's paragraph 106(a) on pages 74 and 75?

25   A.  Yes.  Then he resolves it by offering -- Mr. Bustamante

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 56 of 66 PageID #:428
Villa - cross by Saltzman
118

1 states that he tries to resolve it by telling him he knows the

2 people in Columbia.

3 Q.  And you're saying that should have caused Mr. Owen to know

4 that this was about illegal narcotics?

5 A.  Well, the part about having a gun pulled on him and being

6 accused of being a DEA agent.

7 Q.  Okay.  Directing your attention to -- I'm almost done -- to

8 page 85, subheading number (6), again, what's the basis for the

9 DEA to believe that Mr. Owen knew that Bustamante was

10 laundering $70,000 of narcotics proceeds which he collected in

11 Boston and deposited at Wire Transfer Business B in Grand

12 Rapids?

13 A.  It's paragraph 132 at the top of page 87.  Bustamante

14 stated:

15          "I have to give it to one of Lalo's contacts.

16          "Cool, awesome.  Thank you, man."

17 Q.  And so any reference to Lalo, any reference that Bustamante

18 makes to Lalo, the DEA believes it should have alerted Mr. Owen

19 that the money that was being discussed was obtained from

20 illegal narcotics trafficking?

21 A.  Well, this transaction and conversation happened on the

22 24th -- excuse me -- the 24th through the 27th of April, and

23 early in April Mr. Owen and Bustamante discussed concealing the

24 origin of funds when dealing with Lalo.

25 Q.  That's the conversation you referenced earlier in your

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 57 of 66 PageID #:429
Villa - cross by Saltzman
119

1  testimony.

2  A.  That's right, yes.

3  Q.  Okay.  Lastly, page 108 --

4  A.  Oh, I'm sorry.  There was another, I believe, on 136.

5         MS. BOGART:  Paragraph or page?  I'm sorry.

6         THE WITNESS:  I'm sorry.  Paragraph 136 is a reference

7  to it being Lalo's stuff.

8  BY MR. SALTZMAN:

9  Q.  Okay.

10  A.  It's a conversation between Mr. Bustamante and Mr. Owen.

11  Q.  On page -- directing your attention, agent, to page 108,

12  subheading (11), Bustamante with assistance from Owen --

13         MR. SALTZMAN:  Well, strike that.  I don't need to ask

14  that.

15  BY MR. SALTZMAN:

16  Q.  Oh, directing your attention to page 112, paragraph 197,

17  does the DEA -- is there any factual basis to conclude that

18  Mr. Owen knew about the search warrant executed as described in

19  that paragraph or the DEA's execution of a search warrant on

20  Wire Transfer Business A in Chicago as described in paragraph

21  199(b)?  In other words, did Mr. Owen -- does the DEA have any

22  reason to believe that Mr. Owen knew about those seizures by

23  the DEA?

24  A.  I would have to check the line sheets and this complaint to

25  see if there's any specific conversations between

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 58 of 66 PageID #:430
Villa - redirect by McCrobie
120

1   Mr. Bustamante and Mr. Owen.

2           MR. SALTZMAN:  I don't have any further questions at

3   this time, Judge.

4           THE COURT:  Any redirect on behalf of the Government?

5           MR. McCROBIE:  A little bit, Your Honor.

6           THE COURT:  All right.

7                      REDIRECT EXAMINATION

8   BY MR. McCROBIE:

9   Q.  Agent Villa, do you recall those last few questions you

10  received about whether Mr. Owen was aware of search warrants?

11  A.  Yes.

12  Q.  Could you please turn to page 116 -- 115, towards the

13  bottom, paragraph 201?

14  A.  Okay.

15  Q.  Who are the participants in the conversation described in

16  this paragraph?

17  A.  The participants are Mr. Bustamante and Mr. Owen.

18  Q.  And if you could please look at subparagraph (b) on page

19  116, is there a discussion there between Mr. Bustamante and

20  Mr. Owen about warrants?

21  A.  Yes.

22  Q.  In both Chicago and Grand Rapids?

23  A.  Yes.

24  Q.  Does Huntington Bank have branches in the Northern District

25  of Illinois?

1    A.  Yes.

2    Q.  Was Mr. Bustamante -- did Mr. Bustamante make a cash

3    deposit at a Huntington Bank in the Northern District of

4    Illinois?

5    A.  Yes.

6    Q.  Who was the account holder who held the account where he

7    deposited the money?

8    A.  Mr. Barton was the signer on the account.

9    Q.  Do you recall the questions about coming up with an origin

10   of funds narrative?

11   A.  Yes.

12   Q.  And the discussion was as to giving Jery something,

13   correct --

14   A.  Yes.

15   Q.  -- regarding the origin?

16   A.  Yes.

17   Q.  In your investigation, have you learned whether anyone

18   associated with banks is also interested in origin of funds?

19   A.  Can you repeat that?

20   Q.  Sure.  In the banks, do the banks have bank compliance

21   officers?

22   A.  Yes.

23   Q.  Do those compliance officers sometimes look into origin of

24   funds for large deposits?

25   A.  Yes, and they would compare that to the account opening

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 60 of 66 PageID #:432
Villa - recross by Bogart
122

1  documents in which an individual might state what their

2  business is affiliated with and see if that makes sense.

3  Q.  And based on your knowledge of this investigation, did

4  those types of communications with bank compliance officers

5  occur?

6  A.  Yes.

7  Q.  Who participated in those conversations?

8  A.  Well, according to the complaint, you had Mr. Barton

9  stating that he had conversations with individuals at the bank.

10         MR. McCROBIE:  Nothing further, Your Honor.

11         THE COURT:  Very brief redirect -- recross.

12         MS. BOGART:  Yes.

13                   RECROSS-EXAMINATION

14  BY MS. BOGART:

15  Q.  Can you identify where in the complaint that occurred?

16         THE COURT:  The last thing he mentioned?

17         MS. BOGART:  Yes.

18         THE COURT:  So she wants you to identify where in the

19  complaint the last thing you mentioned with respect to -- I

20  think you said Mr. Barton had some discussions with the bank.

21         THE WITNESS:  Mr. Barton described that he had

22  discussions with the bank.

23         THE COURT:  Can you identify that for Ms. Bogart?

24         THE WITNESS:  They're located in the complaint.

25         MR. McCROBIE:  Your Honor, can I make a paragraph

Case: 1:19-cr-00733 Document #: 59 Filed: 01/14/20 Page 61 of 66 PageID #:433
Villa - recross by Bogart
123

1    suggestion and see if that's where the agent is thinking about?

2              THE COURT:  Any objection to a paragraph suggestion?

3              MS. BOGART:  I don't.

4              THE COURT:  Go ahead.

5              MR. McCROBIE:  Paragraph 59.

6              MS. BOGART:  What page is that?

7              MR. McCROBIE:  48.

8              MS. BOGART:  Thank you.

9              THE WITNESS:  Yes, that was a discussion between

10   Mr. Barton and Mr. Bustamante where they were discussing what

11   should be said to Huntington Bank.

12   BY MS. BOGART:

13   Q.  Okay.  So in this call Mr. Barton is actually asking

14   questions about --

15             THE COURT:  Can you go to the microphone?

16             MS. BOGART:  Yes, I can.

17             THE COURT:  We need to have it picked up.  Thank you.

18             MS. BOGART:  I'm sorry.

19   BY MS. BOGART:

20   Q.  In this call, which is May 20th, 2019, Mr. Barton is

21   actually asking questions about deposits, moneys to be

22   deposited?

23   A.  He was asking about the Individual F that had made a

24   deposit.

25   Q.  Yeah, made a deposit into his account.

1  A.  Yes.

2  Q.  And did he indicate that he was unaware of Individual F?

3  He says in subparagraph (a) on page 49:

4       "I don't want to do anything that gets us in any form

5  of trouble, so I have a couple questions.  If Huntington Bank

6  would decide to run a background check on Fernando, Individual

7  F, would they find anything bad?"

8       Then Bustamante says:

9       "Not to my knowledge."

10  A.  Yes.

11  Q.  Right?

12  A.  He says that, yes.

13  Q.  Okay.  So he's asking questions to understand about a

14  deposit that was made by Bustamante or at Bustamante's

15  direction?

16  A.  Yes.

17       MS. BOGART:  Okay.

18       MR. SALTZMAN:  I don't have anything further, Judge.

19       THE COURT:  All right.  Thank you.  You may step down.

20    (Witness excused.)

21       THE COURT:  Any further witnesses on behalf of the

22  Government?

23       MR. McCROBIE:  No, Your Honor.

24       THE COURT:  Any witnesses on behalf of Mr. Barton?

25       MS. BOGART:  No, Your Honor.

1    THE COURT:  Any witnesses on behalf of Mr. Owen?

2    MR. SALTZMAN:  No, Judge.

3    THE COURT:  Okay.  So we can talk about -- I had

4    mentioned to you that given the extent of the pages on the

5    charge and the length that we had in the preliminary hearing

6    that I would allow for some briefing in argument.  So what I

7    intend to do is I intend to order an expedited copy of the

8    transcript.  Anybody else who wants one has to pay the copy

9    cost of that transcript.  I can't order the, you know, court

10   reporter to not --

11   MR. SALTZMAN:  Well, we're CJA.

12   THE COURT:  I know, but there's just a --

13   MR. SALTZMAN:  So we've got to fill out the form.

14   THE COURT:  It would be a copy cost involved instead

15   of just the -- you know, the Court is ordering an expedited

16   version.

17   MS. BOGART:  Oh, okay.

18   MR. SALTZMAN:  All right.

19   THE COURT:  So there would be a copying cost involved.

20   MS. BOGART:  Okay.  So there may be -- I'm not clear

21   on the process because I tried to order the first day, thinking

22   I could get it going, and the court reporter told me that we

23   had to have some kind of a court order or something.

24   THE COURT:  So by the Court then ordering it, I will

25   make it clear that the Court will be ordering an expedited copy

1  of the transcript, and any, you know, party who wishes to pay a
2  copying cost may do so.
3          MS. BOGART:  Okay.
4          THE COURT:  I'll make that clear.
5          MS. BOGART:  Great.
6          THE COURT:  So the issue then is I'm not sure how long
7  an expedited version would take.  So we could do a brief, you
8  know, X number of days following the transcript being
9  available.  So how much time do you want after the transcript
10 is available?  I'll just do simultaneous.  The Government is
11 the one that won't get the last word on simultaneous, but
12 you'll live with that.
13         MR. McCROBIE:  Yes.
14         MR. SALTZMAN:  I was asking for seven days after,
15 Judge.
16         THE COURT:  Any objection to seven days after?
17         MS. BOGART:  Well, my only concern is when I get it
18 because I --
19         THE COURT:  Well, it's seven days after.
20         MS. BOGART:  Yeah.
21         THE COURT:  I have no idea how long it's going to take
22 for the transcript.
23         MS. BOGART:  Right, and I don't either.
24         THE COURT:  It is about three or four hours long.  It
25 shouldn't take that long, but I don't know.

1    MS. BOGART:  We're heading into the Thanksgiving

2 holiday weekend.

3    THE COURT:  Yes.

4    MS. BOGART:  My only request would be that it come --

5 that the due date would be the 12th of December, which would be

6 seven days after the 5th.

7    THE COURT:  Any objection to the 12th?

8    MR. SALTZMAN:  Well, I think the issue is that this

9 may go to the grand jury on December 5th.

10    THE COURT:  Okay.

11    MR. McCROBIE:  I just want to make the Court aware, as

12 is reflected on the docket, the Government does have an

13 extension to indict which currently expires on December 5th.

14    THE COURT:  And we don't know if you're going to try

15 to extend that.

16    MR. McCROBIE:  Currently I have no plans to seek an

17 extension.

18    THE COURT:  So we have to make a determination prior

19 to that, arguably.  So I leave it to you.  I mean, I leave it

20 to you all.

21    MS. BOGART:  We would still like the transcript in any

22 event.

23    THE COURT:  Right.

24    MS. BOGART:  The question is whether we put the Court

25 to the burden of trying to rule on this if the Government is

1  going to preempt the process.

2       MR. SALTZMAN:  Judge, if I may suggest, given where we

3  are, what might be the best way to go is that when we get the

4  transcript for us to be back in court to say that this is when

5  we think we can have it briefed.  At that time if --

6       THE COURT:  All right.  That makes sense.  We can have

7  a status hearing.  So as soon as the transcript comes to us, we

8  will issue an order asking you to come in on a status very

9  quickly thereafter.  All right?  Anything else that we need to

10  deal with?

11       MS. BOGART:  That would be great.

12       MR. SALTZMAN:  Thank you, Judge.

13       MR. McCROBIE:  That's all from the Government.

14       THE COURT:  All right.  Thank you very much.

15       MS. BOGART:  Thank you.

16       MR. McCROBIE:  Thank you.

17       MR. SALTZMAN:  Thank you.

18     (Proceedings concluded.)

19          C  E  R  T  I  F  I  C  A  T  E

20       I, Patrick J. Mullen, do hereby certify that the
foregoing is an accurate transcript produced from an audio

21  recording of the proceedings had in the above-entitled case
before the Honorable MARIA VALDEZ, one of the magistrate judges

22  of said court, at Chicago, Illinois, on November 14, 2019.

23                         */s/ Patrick J. Mullen*
                       Official Court Reporter

24                         United States District Court
                       Northern District of Illinois

25                         Eastern Division